THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARK GARDNER, Defendant-Appellant.

Fifth District   No. 80-434

Opinion filed February 2, 1982.

Mary Robinson and Marilyn Martin, both of State Appellate Defender's Office, of Elgin, and Kathleen Hamill, law student, for appellant.

Martin N. Ashley and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, of Mt. Vernon, and David J. Mullett, research assistant, for the People.

JUSTICE WELCH delivered the opinion of the court:

Following a jury trial in the Circuit Court of Williamson County, the defendant was convicted of burglary and theft. He was sentenced to a maximum extended term of 14 years' imprisonment for burglary and two years for theft, the sentences to run concurrently. An appeal of both convictions and sentences has been perfected to this court, where the defendant presents the following arguments: (1) this court should not have allowed him to be represented by the office of the State Appellate Defender, which also represented a co-defendant in his appeal; (2) he was denied his statutory right to a speedy trial; (3) the trial court should have suppressed certain physical evidence which was admitted at trial; (4) the

trial court erred in excluding a letter written by a co-defendant to his wife; (5) he was improperly cross-examined at trial about certain prior convictions; and (6) several errors were committed at his sentencing hearing. Although the defendant does not challenge the sufficiency of the evidence upon which he was convicted, a brief statement of that evidence is necessary to the extent that it illuminates the issues argued.

Between 10 p.m. on June 21, 1979, and 4 a.m. the following day several items, including guns, ammunition and stereo equipment were taken from the Williamson County home of Carbondale police officer Peter Emmitt. In the mid-morning of June 22, Murphysboro police discovered Richard Nitz in possession of a revolver belonging to Emmitt. Nitz and defendant Gardner were arrested on possessory weapons offenses, and Nitz' pickup truck was taken to the Murphysboro police station. After obtaining a search warrant, Murphysboro authorities found, in the bed of Nitz' truck, some of the property which had been taken from the Emmitt residence.

Nitz and Gardner were incarcerated in the Jackson County jail while they awaited trial on the weapons offenses. During this period of incarceration, they received a copy of an information which had been filed in Williamson County on June 25, 1979, charging them with the Emmitt burglary. After the conclusion of the Jackson County prosecutions, Nitz and Gardner were transferred to the Williamson County jail.

In May of 1980, Richard Nitz entered a plea of guilty to burglary and theft, based on the offenses committed at the Emmitt residence. Pursuant to plea negotiations, Nitz received a sentence of four years' imprisonment in exchange for his agreement to testify, at defendant Gardner's trial, that Gardner entered Emmitt's home and removed some of the property which was ultimately recovered from Nitz' truck.

Defendant Gardner's case came to trial in July of 1980. Richard Nitz was the State's chief witness against him. Nitz stated that, at about 12:30 a.m. on June 22, he, Gardner and a woman named Cheri King left Carbondale in King's car. Gardner told King to drive to an area known as Crab Orchard Estates, with which Nitz claimed he was unfamiliar. At about 1 a.m., they arrived at Emmitt's house. Gardner went inside, and came out with a television set, which he loaded into King's car. Nitz and King then joined Gardner in removing items from the house and loading them into the car.

When their task was completed, the three went to Cheri King's house and deposited the stolen property. Nitz testified that he and Gardner returned to a parking lot in Carbondale, where, from 3 until 7:30 a.m., they worked on Gardner's disabled truck. At that time, Gardner drove Nitz' truck to John A. Logan College, where he dropped Nitz off for classes. According to Nitz, when Gardner returned to pick him up several

hours later, Cheri King was with him, and the stolen property was in the bed of Nitz' truck.

Nitz drove the three to Jim Jackson's Shell Station in Murphysboro. Jackson testified that, at 9 a.m., Gardner had telephoned him to offer to sell him some guns and stereo equipment. An investigator for Gardner's former trial counsel was introduced to say that Jackson told him that Nitz, not Gardner, had telephoned. Jackson did not remember answering any of the investigator's questions about the case. After receiving the call, Jackson alerted the Murphysboro police about the possibility of stolen property, and they set up surveillance.

When they arrived, at 11 a.m., Nitz and Gardner went into the station's office, Nitz holding the revolver. Nitz handed the gun to Gardner, who offered it to Jackson. After Jackson said that he was not interested in it, Gardner returned the revolver to Nitz, and stated that he wanted to show Jackson a shotgun. Nitz and Gardner then started to return to the truck, and were arrested by Murphysboro authorities. Cheri King, who did not enter the office of the service station, did not testify at Gardner's trial.

Defendant Gardner took the stand and presented an alibi defense. He testified that between 10 p.m. on June 21 and 4:15 a.m. on June 22, he was with Richard Nitz at several locations in and around Carbondale. According to Gardner, much of this time was consumed in towing or working on his disabled truck. Defense witness Johna Batson, who was a bartender at the King's Inn Lounge in Carbondale, stated that Gardner was at the King's Inn with a friend known to her as "Josh" between 10 p.m. and midnight on June 21 and between 1:40 a.m. and 2:20 p.m. on June 22.

Gardner testified that Nitz was with him until 4:15 a.m., when Nitz left in his own truck, presumably to go to John A. Logan College. Nitz rejoined Gardner in Carbondale at about 9 a.m., with Cheri King as a passenger in his truck, and the three went to Jackson's Shell. In Gardner's version of the events, he never called Jim Jackson that morning, he did not offer any property to Jackson, and he was in the process of obtaining the keys to the station's wrecker to tow his own truck when he was arrested. Gardner also stated that he had never seen any of the stolen property either in the passenger compartment or in the bed of Nitz' truck before his arrest. However, a print of Gardner's right ring finger was taken from a turntable dustcover belonging to Peter Emmitt, recovered from Nitz' truck, and claimed by Gardner at trial to have never previously been seen by him.

The first issue which must be addressed in this case concerns conflicting representation. Gardner's counsel, from the office of the State Appellate Defender, states that this court should have allowed that office to withdraw as Gardner's counsel on appeal, because Richard Nitz was

represented by counsel from that office in his appeal from his guilty plea. The People respond that this court's earlier denial of the motion to withdraw as counsel bars further litigation of this issue, that the issues raised on appeal by Nitz and Gardner do not demonstrate antagonistic defenses in this court, that the filing of an opinion in Nitz' case before the motion to withdraw was made in Gardner's case removed any possible conflict, and that the transfer of Gardner's case to a district office of the State Appellate Defender which did not represent Nitz cures any problems raised by conflicting defenses.

In *People v. Rogers* (1981), 101 Ill. App. 3d 614, 428 N.E.2d 547, this court considered the approach which should be taken when co-defendants are represented by attorneys of the office of the State Appellate Defender, whether from the same or different district offices. It was stated that, while the standards for determining the existence of a conflict should be less rigorous for appellate counsel than for trial counsel, the guidelines of *People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261, are nonetheless relevant to such an inquiry. A precise standard for this type of issue was not pronounced in *Rogers*, for the court found no inconsistency in the positions taken in Rogers' appeal and that of his co-defendant. In our opinion, a similar situation obtains in this case.

Richard Nitz' appeal addressed the single issue of whether he had waived his right to a speedy trial by pleading guilty to the Emmitt burglary. As the People correctly note, this position does not affect the presentation of Gardner's appeal. In a similar manner, most of the arguments in Gardner's brief are concerned with errors in his trial that are completely unrelated to Nitz' case. Gardner does not argue that he was not proven guilty beyond a reasonable doubt, and therefore he makes no direct attack on the credibility of Richard Nitz.

The two arguments made by Gardner which refer to Nitz are that Gardner's sentence was disproportionate to that imposed on Nitz, and that the trial court should have admitted into evidence to impeach Nitz a letter from Nitz to his wife. As we held in *Rogers*, the first argument presents no conflict because Gardner's assertion that his sentence was excessive does not concede the propriety of Nitz' sentence. Moreover, Nitz' sentence was not challenged on appeal.

Gardner's counsel urges that the challenge to the trial court's ruling on the Nitz letter creates a conflict of interest because (1) an attorney is obligated not to disclose a secret of a client in order to benefit himself or a third person (79 Ill. 2d R. 4—101), and (2) Nitz attacked his plea agreement on appeal. Because defense counsel made no reference to a duty to protect clients' confidences until the reply brief, we will consider only the latter of those contentions. Ill. Rev. Stat. 1979, ch. 110A, par. 341(g); *People v. Borges* (1980), 88 Ill. App. 3d 912, 410 N.E.2d 1076.

■■ As we indicated above, Nitz' appeal consisted solely of an attempt to assert the bar of the speedy-trial rule. He did not raise any claim that he did not commit the crimes to which he entered a plea of guilty. Thus, even assuming that the desired introduction of the Nitz letter is characterized as a direct attack on Nitz' credibility, Gardner's position on that issue does not in any way undermine Nitz' appeal, and vice versa. We find nothing in either case which would act to inhibit the presentation of a vigorous defense on behalf of Gardner or Nitz. Therefore, we confirm our previous order denying the office of the State Appellate Defender leave to withdraw as counsel for defendant Gardner.

Next, it is claimed that the defendant was denied a speedy trial, as required by section 103—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a)). Since he was held by authorities in both Williamson and Jackson counties prior to his trial for the Emmitt burglary, the threshold question is when the 120-day period began to run for purposes of the Williamson County prosecution. The defendant argues that that period commenced on June 28, 1979, when a Williamson County arrest warrant was delivered to him in the Jackson County jail by jail personnel. The trial court held that the time began to run on August 22, 1979, when Gardner and Nitz were brought, pursuant to a writ of *habeas corpus ad prosequendum*, to the Williamson County jail, where they spent the evening before their first appearance the following day. Both men were returned to Jackson County after that appearance. The People contend that either the trial court's ruling was correct or Williamson County did not take custody of the defendant until September 20, 1979, when the Jackson County proceedings concluded.

In support of his theory that his receipt of the Williamson County arrest warrant acted to commence the 120-day speedy-trial period, the defendant points to *People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242. There, the defendant was first charged with a Champaign County crime, then was arrested in DeWitt County on other charges. He later escaped from DeWitt County, and was eventually apprehended in Champaign County by F.B.I. agents acting under the authority of a Federal fugitive from justice warrant obtained by DeWitt County. While in the Champaign County jail, the defendant was arrested on the Champaign County warrant, taken before a magistrate and served with a copy of the original Champaign County complaint. The supreme court held that the defendant was "in custody" of Champaign County from the date of the service of the Champaign County arrest warrant. The 120-day period did not begin on a later date when DeWitt County, having finished with the defendant, turned him back over to Champaign County in order to allow the latter county to proceed against him.

The defendant argues that the fact that the service of the arrest war-

rant, and not the later transfer of custody, was significant in *Fosdick* means that the service of the arrest warrant should commence the 120-day period in this case as well. However, in *Fosdick*, the defendant was served with the Champaign County warrant while he was in Champaign County. Cases which involve a warrant issued by a noncustodial county and delivered in a custodial county have followed a different rule.

For example, in *People v. Clark* (1968), 104 Ill. App. 2d 12, 244 N.E.2d 842, the defendant was arrested in Rock Island County on January 14, 1967, and the following day was turned over to Peoria County, where he was under a previous indictment. Rock Island County authorities obtained an indictment and bench warrant against the defendant on February 17, 1967, but a copy of the warrant was not sent to the Peoria sheriff until March 27. The defendant was returned to Rock Island County on April 19. In holding that the defendant entered into the custody of Rock Island County for the purposes of the speedy trial statute on the last date, the court enunciated the following rule:

> "Where, as here, a defendant is in custody awaiting trial in one county and there is a charge pending against him in another county, we believe he cannot be deemed to be in custody for the latter offense until such time as the proceedings against him in the first county are terminated and he is then either returned to, or held in custody for, the second county." 104 Ill. App. 2d 12, 20, 244 N.E.2d 842, 846.

The defendant asserts that his case is distinguishable from *Clark*, because, in *Clark*, no charges were pending against the defendant in Rock Island County when he was turned over to Peoria authorities, and because the Rock Island warrant was never served on the defendant but was only delivered to the Peoria sheriff. We do not see the absence of charges in *Clark* as a factor which makes that case inapplicable here, for, if anything, the arrest of Clark in Rock Island County renders his case stronger than that presented here, since Gardner was arrested in the custodial county, and not in Williamson County, which prosecuted him last.

It must be conceded that in this case, unlike *Clark*, the defendant was personally served with a copy of the arrest warrant, even though the "return of service" portion of that warrant was not filled in. As noted by the defendant, several other cases which have followed *Clark* have involved warrants which were never served on the defendant in the custodial county. (*People v. Akins* (1971), 132 Ill. App. 2d 1033, 270 N.E.2d 107; *People v. Mikrut* (1969), 117 Ill. App. 2d 444, 253 N.E.2d 556.) However, in *People v. Karr* (1979), 68 Ill. App. 3d 1040, 386 N.E.2d 927, the court followed *Clark* even though the defendant had received an "informal" photocopy of a criminal complaint and warrant while he was incarcerated. We can find no significant difference between Gardner's

receipt of the Williamson County warrant and the "informal" service of similar documents in *Karr*. Thus, the service of the Williamson County arrest warrant does not remove this case from the rule of *Clark*.

The defendant states that *Karr* should not be followed here, because the second county in that case took no action to prosecute the defendant after the service of its warrant, while proceedings were had in Williamson County after Gardner received the warrant, but before the Jackson County prosecution had terminated. Yet, a closer reading of *Karr* reveals that the absence of proceedings in the second county was not a factor relied upon in the court's decision. (68 Ill. App. 3d 1040, 1047, 386 N.E.2d 927, 932.) Moreover, the court in *People v. Evans* (1979), 75 Ill. App. 3d 949, 394 N.E.2d 710, suggested in *dicta* that defendant is not in the custody of the second county until the termination of the proceedings in the custodial county, even if the defendant is brought to the second county for appearances pursuant to writs of *habeas corpus ad prosequendum*, as he was here. According to *Karr* and *Evans*, the defendant's appearance in Williamson County does not mean that he was in the custody of Williamson County any earlier than the termination of the Jackson County prosecution.

Nor does *People v. Kerley* (1979), 72 Ill. App. 3d 916, 391 N.E.2d 225, furnish the defendant any support. Kerley was arrested and housed in the Cook County jail on March 28, 1977. Two days later, Du Page County authorities lodged a detainer against him at the jail. On April 7, the defendant entered guilty pleas to several of the Cook County charges and the remainder of those charges were dismissed. He was sentenced to serve 30 days in the Cook County jail, with credit for time served. Kerley was released from that jail on April 22, on which date he was served with a complaint and warrant by Du Page County authorities and brought to the Du Page County jail.

The defendant cites *Kerley* as authority for the proposition that the date of physical transfer to the second county does not automatically determine the initiation of the 120-day period, and the *Kerley* court did state that that period began to run on April 7, 1977, and not on April 22. But, this result was reached by strict application of the *Clark* rule, which states that the defendant is in the custody of the second county after the termination of the proceedings in the custodial county. In *Kerley*, the Cook County prosecution concluded on April 7, 1977, when the defendant entered a plea of guilty and was sentenced. Because those proceedings had ended, and because Du Page County had placed a detainer prior to April 7, there was therefore no obstacle to trying the defendant in Du Page County.

Instead of bolstering the defendant's position, *Kerley* is only additional authority for the proposition that, once the proceedings in the cus-

todial county have concluded, the 120-day rule begins to run against a second county when the defendant is returned to, or held for, the second county. Since a Williamson County warrant was served on this defendant in Jackson County prior to the termination of the Jackson County proceedings, we are of the opinion that Gardner was being held for Williamson County as soon as the Jackson County prosecution had concluded. The 120-day rule thus began in this case on September 20, 1979.

Under our interpretation of the speedy-trial rule, defendant's 120-day period would have expired on January 18, 1980. But, on January 11, the defendant filed a motion for new counsel, and, as noted by the People, all delays between that date and the July 1980 trial may be attributed to the defendant. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(f).) Therefore, the defendant has not been denied his statutory right to a speedy trial.

The defendant additionally takes issue with the trial court's denial of his motion to suppress, as products of an illegal search, certain items taken, pursuant to a search warrant, from the bed of Nitz' truck. On November 30, 1979, Nitz and Gardner filed a joint suppression motion. It alleged simply that Nitz' truck had been searched illegally and that certain items had been seized. In April 1980, the court granted the State's motion to dismiss the motion to suppress as to Gardner, for he had alleged nothing which would give rise to an expectation of privacy in Nitz' truck. Gardner was granted leave to file a new suppression motion, which he did on July 1, 1980. In this motion, Gardner stated that he had been a passenger in Nitz' truck and that he was charged with having possession of the property which was seized from Nitz' truck.

When the motion was heard on July 7, 1980, the court stated that, according to the motion, Gardner was only a passenger in Nitz' truck and therefore Gardner had no reasonable expectation of privacy which could have been violated by the search and seizure. Nonetheless, Gardner was permitted to present any facts which could establish such a privacy interest.

Gardner testified that his connections with Nitz' truck, beyond his presence as a passenger, were two-fold. First, he had assisted in the construction of the camper top on the bed of the truck and had supplied some of the wood, paint and carpeting which had been used in that top. Second, Gardner had kept several items in the bed of the truck, including a mattress which belonged to his wife, and an ice chest, fishing pole and stereo speaker which were his. Of these possessions, only the stereo speaker was seized by the Murphysboro police and not returned to the defendant by July 7.

Following this testimony from Gardner, the trial court denied the motion to suppress, stating that nothing had been shown which would raise Gardner's expectations of privacy above those of an ordinary pas-

senger in the truck. The defendant asserts that, in making this finding, the trial court incorrectly relied upon Gardner's lack of a property interest in the truck or the allegedly stolen goods and thus failed to follow the principles contained in *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.

In *Rakas*, two passengers in an automobile objected to a search of the vehicle, which yielded a box of rifle shells in the locked glove compartment and a sawed-off rifle under the front passenger seat. The Supreme Court stated that the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place." 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430, citing *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507.

The court deemed it significant that the two passengers, as here, did not claim ownership of the car or of the evidence seized. Also important was that "they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." (439 U.S. 128, 148-49, 58 L. Ed. 2d 387, 404, 99 S. Ct. 421, 433.) The evidence in *Rakas* was therefore insufficient to permit either passenger to challenge the legality of the search of the automobile.

Defendant Gardner argues that his expectations of privacy in the bed of Nitz' truck are greater than those of the passengers in *Rakas* because (1) he helped construct the camper top, (2) he stored his personal possessions in the bed, (3) Nitz' wife was the mother of Gardner's wife and the two families lived next door to each other, and (4) the modified truck bed was suitable for limited residential purposes and is distinguishable from a standard passenger automobile.

■■ In reviewing this motion to suppress, we cannot disturb the trial court's ruling unless it was manifestly erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 401 N.E.2d 513.) The defendant's testimony does not give rise to manifest error by the trial court. To begin with, his claims of contribution to the construction of the camper can only be described as vague. In his own terms, we know only that he contributed "some" labor, money, and supplies to the truck. Such a nebulous statement of assistance does not cast doubt on the trial court's rejection of defendant's position.

■■ But even if we accept the arguments that work on a vehicle, storage of nonevidentiary property in it, and an in-law relationship with the vehicle's owner are significant factors in creating a privacy interest therein, we think that the nature of the vehicle belies defendant's expectations of

privacy. As described in testimony and as depicted in photographic exhibits, the "camper" portion of the truck was not directly accessible from the passenger compartment. In this respect, the camper was like the trunk of a normal automobile, in which a passenger typically has no legitimate expectation of privacy. (*Rakas*, 439 U.S. 128, 148-49, 58 L. Ed. 2d 387, 404, 99 S. Ct. 421, 433.) Yet, while a trunk is not generally open to observation, the front wall of the camper contained two windows, through which a passerby could peer, unobstructed by blinds, shades or drapes. The camper top does not appear to have any windows on its side walls, and we have no information before us pertaining to any window or door on the rear of the camper.

The defendant characterizes the camper's two front windows as "covered with an opaque or semi-opaque substance." No matter how one describes these windows, the fact remains that one can easily see from the bed of the truck through a window to the rear-view mirror mounted on the driver's door. Thus, the area which was searched combines the physical inaccessibility of a trunk with some degree of the visual accessibility of a passenger compartment. This combination of attributes is fatal to defendant's expectations of privacy, especially since he did not claim any ownership interest in the truck or the seized evidence. (See also *People v. Beroukas* (1981), 98 Ill. App. 3d 990, 425 N.E.2d 5.) Nor do the additional factors enumerated by the defendant indicate that the trial court's ruling was manifestly erroneous. The court correctly applied the law as described in *Rakas*, and we affirm the denial of defendant's motion on the ground that the defendant did not show the existence of any fourth amendment rights which could have been violated by the search and seizure.

As a further assignment of error, the defendant asserts that the trial court should have allowed defense counsel to cross-examine Richard Nitz about a letter which Nitz wrote to his wife while he was in the Jackson County jail. That letter began with the following paragraph:

"All right, Im going to tell you 'everything' from the time I left the house, till the time I was arrested. I didn't want to do this because once I do the jailer or whoever reads the letters before they send them off, they're gonna take this letter to the State's Attorney!"

The letter gave a different version of Nitz' whereabouts on June 21 and 22, 1979, than that given by him at Gardner's trial. Nitz wrote it in late June or early July 1979, and it was received by his wife. Mrs. Nitz took the letter to attorney Gerald Reed, who represented both Nitz and Gardner at that time, to aid the preparation of her husband's defense. Nitz never authorized her to show the letter to Reed, and, in the letter, told her:

"You know more about it now than Jerry [Reed] does. I didnt tell Jerry the whole story because he said he wasn't for sure whether or

not he was going to represent us. I told it all to you so you can, for yourself, check it out so you know that Im not lieing to you about it."

About a month before his trial, Gardner asked Reed if he had Nitz' letter in his files  Gardner had learned of the contents of the letter from his wife, Mrs. Nitz' daughter, who had read it when Mrs. Nitz first received it. Gardner requested the letter, and, on July 8, 1980, Reed obtained permission from Mrs. Nitz to give a copy of the letter to Gardner, which he did. Mrs. Nitz came to Reed's office and took possession of the original letter.

When Richard Nitz testified at Gardner's trial, Gardner's attorney attempted to impeach him by using the photocopied letter. The State objected and an *in camera* conference was called, where both Nitz and his wife expressed opposition to the disclosure of the document. The trial court prohibited the use of the letter, stating that its disclosure would violate the marital and attorney-client privileges and that Gardner had never mentioned the letter in his answers to the State's requests for discovery. It was also questioned whether use of the copy, instead of the original retained by Mrs. Nitz, would be proper. The defendant has preserved his objections to the ruling, and, in this court, contests all of the possible reasons in support of the decision. We need only consider one of those reasons.

■■ A confidential letter written from one spouse to another is privileged (Ill. Rev. Stat. 1979, ch. 38, par. 155—1; *People v. Simpson* (1977), 68 Ill. 2d 276, 369 N.E.2d 1248) and may not be used at trial over the assertion of the privilege by a party to it. There is no doubt that the excluded letter was written by Nitz to his wife, who was married to him at the time of communication, as well as during Gardner's trial. And, despite Gardner's claim that Nitz desired his letter to fall into the hands of jail personnel, we think that Nitz' fears of possible interception and his use of endearing language prove that he intended this message as confidential. Thus, the letter has met the initial requirements of the marital privilege.

That privilege may be lost in several ways. For example, if a third person learns of the contents of the letter by interception, or through loss or misdelivery of the letter by its custodian, that person may give testimony about the contents of the communication. Or, if the holder of the privilege intentionally reveals those contents to a third person, he has relinquished the privilege. (*Simpson*, 68 Ill. 2d 276, 279, 369 N.E.2d 1248, 1251.) Neither exception applies here because nothing indicates that a third party ever learned the substance of Nitz' letter before it was received by Mrs. Nitz.

■■■ It may be argued that Mrs. Nitz destroyed her husband's right to assert the privilege by showing the letter to Mrs. Gardner, Reed and

defendant Gardner. In fact, such a rule is followed in other jurisdictions. (See 81 Am. Jur. 2d *Witnesses* §157 (1976).) But, in Illinois the privilege is not lost even if "the delivery or disclosure of the letter be due to the betrayal or connivance of the spouse to whom the message is directed." (McCormick, Evidence §82, at 168 (2d ed. 1972), quoted in *Simpson,* 68 Ill. 2d 276, 279, 369 N.E.2d 1248, 1251.) As the trial court ruled, then, the marital privilege attached to the Nitz letter, and it was not lost by interception, by Nitz' revelation of its contents or, as actually happened, by Mrs. Nitz' disclosure of the letter. Richard Nitz, who consistently asserted the privilege, was entitled to rely upon it, and the trial court was correct in preventing use of the letter.

As noted above, the defendant was prosecuted in Jackson County before his case came to trial in Williamson County. In the Circuit Court of Jackson County, he and Richard Nitz were charged with unlawful use of weapons and possession of weapons without valid firearm owner's identification cards. Gardner was acquitted of the first of these charges and was convicted of the latter charge. In response to direct examination at the burglary trial, Gardner mentioned the outcome of the Jackson County proceedings.

The Williamson County prosecutor then asked Gardner whether he had been found not guilty of unlawful possession of weapons and whether he could not have been found guilty of the I.D. card offense without being in possession of a weapon. The defendant answered both questions in the affirmative. The prosecutor then asked him to repeat the offenses of which he had been convicted earlier, and the counties in which those offenses occurred.

In this appeal, the defendant challenges the propriety of the prosecutor's impeachment of him. He asserts that, in all of the questions discussed in the preceding paragraph, the prosecutor was allowed "to probe and expand the details of the prior offenses in the guise of impeachment." He also argues that the question pertaining to the possession of a weapon as a prerequisite for the Jackson County conviction was an improper attempt to prove the elements of the burglary by showing that Gardner was in possession of weapons belonging to Peter Emmitt.

■■ ■ Defense counsel did not object at trial to any of the allegedly offensive questions, nor was any reference made to this matter in defendant's original or amended written motion for a new trial. By failing to do so, he has not preserved the issues concerning the improper form of the cross-examination. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) However, defendant also argues that the Jackson County conviction should not have been used in any manner to impeach him, because that conviction was reversed on appeal, after he had been tried and sentenced. Due to

the nature of this contention, it is of course not barred by the waiver rule. ■■ The defendant urges that a conviction later reversed for insufficient evidence, as his was, should be treated as void, like an uncounseled felony conviction, and should not be usable for impeachment purposes, according to *Loper v. Beto* (1972), 405 U.S. 473, 31 L. Ed. 2d 374, 92 S. Ct. 1014. This argument is incorrect for three reasons. First, *Loper* was based on the retroactivity of the right to counsel as expressed in *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792. It is asserted that a conviction reversed for failure to prove the defendant's guilt beyond a reasonable doubt is as invalid as a conviction obtained in violation of *Gideon*, because the reasonable doubt standard has due process implications. But, if we accept this argument, then any error great enough to require reversal would automatically necessitate a new trial in every later case in which the reversed conviction was used, on the theory that the defendant was denied due process in the case which resulted in reversal. Yet, all subsequently reversed convictions, even some reversed on constitutional grounds, do not entitle a defendant to a new trial in later cases where he was impeached by such a conviction (*People v. Miller* (1975), 27 Ill. App. 3d 788, 327 N.E.2d 253), and absent any authority that the rule of *Loper* was meant to apply to a case reversed for insufficient evidence, we will not so apply it.

Second, it is a general rule that the State may cross-examine a defendant on his past criminal activities which he has himself mentioned in response to direct examination. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387; *People v. Miller* (1976), 39 Ill. App. 3d 714, 349 N.E.2d 103.) In *Loper*, the uncounseled felony convictions which were complained of were brought out for the first time in cross-examination. There is nothing in the language of *Loper* which states that a defendant may not open the door to cross-examination concerning uncounseled felony convictions by referring to them on direct examination. Thus, even if we agreed that a conviction based on insufficient evidence is to be treated like one obtained without the opportunity for counsel, we must still hold that no error was committed by the State's reference to the Jackson County conviction, since there is no doubt that the defendant mentioned that offense before the prosecution did.

Third, the defendant in this case was also impeached by evidence of other convictions, and thus the evidence of the subsequently reversed conviction was cumulative (*People v. Miller* (1975), 27 Ill. App. 3d 788, 327 N.E.2d 253), unlike in *Loper*, where the defendant attacked all of the convictions which were used to impeach him.

Defendant's final group of arguments pertains to the sentencing hearing and the sentence imposed upon him. He asserts that error was committed because (1) the trial court considered the subsequently re-

versed weapons conviction as a factor in aggravation, (2) he was sentenced without benefit of a current presentence report, (3) the trial court considered that he had received compensation for committing the offense in the form of the proceeds of the theft, (4) his sentence is disproportionate to that given Richard Nitz, (5) his counsel failed to present all information relevant to the statutory mitigating factors, and (6) he should have been given full credit for all time spent in jail since his arrest in Jackson County. Given our disposition of this case, we need discuss only one of these arguments.

In *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, the supreme court held that the receipt of proceeds from a burglary or theft should not be considered as an aggravating factor under section 5—5—3.2(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(a)(2)) when imposing sentence. The defendant argues that the trial court did view his receipt of proceeds from the Emmitt burglary as an aggravating factor. The People respond that the trial court "was simply reading aloud as he scanned the list of aggravating factors contained in the sentencing statute," when he referred to compensation for committing the offense, and that he never actually considered defendant's receipt of proceeds.

■■ As the defendant correctly points out, if the trial judge merely read the factors aloud, then why was reference made to aggravating factors (1), (2), (3) and (7), but not to (4), (5) and (6), which certainly did not apply to him? The record demonstrates that the trial court did improperly consider the defendant's receipt of proceeds, and this cause must be remanded for resentencing according to *Conover*. Given the maximum extended term imposed on the defendant for the burglary we do not believe this to be harmless error (compare *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328), but this statement should not be interpreted to mean that, on remand, such a sentence is necessarily inappropriate.

For the reasons presented above, we affirm defendant's convictions for burglary and theft, vacate defendant's sentences and remand this cause to the Circuit Court of Williamson County for resentencing.

Affirmed in part, vacated in part, remanded.

JONES and KASSERMAN, JJ., concur.