(No. 54790.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. GIRVIES DAVIS, Appellant.

*Opinion filed June 17, 1983.*

4

Randy E. Blue, Deputy Defender, and John W. McGuire, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Michael B. Weinstein, Darrell Panethiere, and James E. Fitzgerald, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Girvies Davis, and a codefendant, Richard Holman, were charged by information with the offense of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1). Following a bench trial in the circuit court of Madison County, defendant was found guilty. Holman, who was tried by a jury in a joint proceeding with defendant, was also found guilty of murder. (Because he was under 18 years of age at the time of the offense, he was sentenced to a term of imprisonment.) At defendant's separate bifurcated sentencing hearing, a jury unanimously determined that the necessary aggravating factors existed, and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The jury returned a verdict directing that defendant be sentenced to death, and the court entered judgment on the verdict. Defendant's post-trial motions were denied, and he brings a direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603), alleging numerous errors at all stages of the proceedings.

The evidence produced at trial indicates that on Friday, July 13, 1979, the victim, 83-year-old Esther Sepmeyer, was shot to death in her home located off Route 162 in Madison County. Rodney Sepmeyer, the grandson of the deceased, testified that he discovered the victim's body, in her bedroom, at approximately 1:50 p.m. She was found in a "kneeling" position in front of her bed.

The witness identified a lawnmower and a replica antique radio as two items which were taken from the victim's home. He stated that the radio was kept in her bedroom, and the lawnmower was located in a spare bedroom. Both of these items had been recovered from defendant's home pursuant to a search warrant.

Sepmeyer further stated that a stereo, color television set, and his .22-caliber semi-automatic rifle were stolen

from the home. The rifle was kept in the back of a metal cabinet in the bedroom. Latent fingerprints recovered from the cabinet, and from a hand mirror found in the home, were identified as belonging to Holman. No fingerprints were discovered which matched those of the defendant.

The State also introduced into evidence a statement defendant allegedly made to a police officer, in which he indicated his complicity in the Sepmeyer murder. The statement, with certain grammatical changes made for purposes of comprehension, reads as follows:

"About two months ago a friend of mine by the name of Ricky Holman who also goes by the name of Ricky Shaw, and I were driving in my 1970 Buick 225. We were driving on the interstate and I remember seeing a sign that said St. Jacobs on it. We drove past this and then we exited the highway by some service stations. We drove down the road until we came to an old house. It was sitting on the right side of the road. This house had a barn sitting in the back. I pulled into the driveway and drove to the back of the house with the front of the car facing the back door. Both Ricky and I got out of the car and went up to the back door. I can't remember if we had to force the door open or not, but we went into the house. The back door leads into a kitchen and from the kitchen I could see that there was an old lady lying in a bed in a bedroom next to the kitchen. Ricky and I both walked into the bedroom right away. I went into the bedroom for a short time and then I started looking around the rest of the house and Ricky stayed in the bedroom. After I left the bedroom, I walked into the dining room and then into another spare room, and then into a hallway. The hallway had stairs leading to the upstairs but I never went upstairs. In the spare room there was a lawn mower, it was yellow with a three and a half h.p. motor. I took the handle off this lawn mower and then I carried it outside and put it in the trunk. While in the back room, I saw a motor thing with a black hose on it. I believe it was used to suck water and things up, but I didn't take it. In the hallway there was a turntable sitting on a heater. I can't re-

call what name it was, but it had a plastic top on it and I loaded it into the car. After I loaded the record player in the car, I came back in and got a T.V. that was sitting in the kitchen. The T.V. was sitting on a table just to the right of the door when you walked into the kitchen. The T.V. was a little white T.V. with black trim around it and it was a color T.V. When I first went into the bedroom with Ricky, I found a .22 new rifle in a box. This gun was in a cabinet in the bedroom and there were also some shells with it. I loaded the gun and gave it to Ricky. When I was outside putting the T.V. in the car, I heard a gunshot and when I got back in the bedroom, the old lady was shot and she was lying on the bed. At the time I told Ricky, let's get out of here. Again when I first went in the house, I saw an antique type radio in the bedroom and I unplugged it and set it on the kitchen table. Just as we were leaving the house the last time, I grabbed the radio and took it. Ricky never said why he shot the lady and I never asked. The old lady in the house looked very old and I think she was wearing a long flowered type dress. Early, while Ricky and I were in the house, Ricky asked me what we were going to do with the old lady and I told him, just leave her because she couldn't identify us. After we left the house, we drove to Perry's Lounge at 9th and Exchange in East St. Louis. I believe we sold the T.V. set there for about Eighty Dollars. After we left Perry's Lounge, we drove up the pay bridge and we drove halfway across and then Ricky threw the .22 rifle into the river. The lawn mower and radio I kept at my house and I'm not sure where the record player went to. I understand that I have the right to talk with a lawyer and have him here. But I want to turn State's evidence and get everything off my mind."

Additional evidence introduced by the State tended to corroborate defendant's statement in a number of particulars. For example, at defendant's direction, a police officer drew a sketch which accurately depicted the interior of the Sepmeyer residence. Defendant was aware of the items which were taken, and the location of those items in the home. He knew that the victim was an elderly woman and

that she was shot in her bedroom. Further, a statement given by Holman verified certain details mentioned in defendant's statement.

Defendant called as a witness Dennis Kuba, a special agent with the Illinois Division of Criminal Investigation. He testified that Lawrence and Harris, two men with whom defendant shared a cellblock, were convicted of another crime to which defendant confessed. The theory of the defense was that defendant merely heard about the Sepmeyer murder from his cellmates and, for some reason, confessed to being one of the perpetrators.

Eric McCray, a friend of defendant, identified the lawnmower and radio taken from the Sepmeyer residence. He stated that, while he was at defendant's home, defendant bought these items from his cousin.

Defendant testified on his own behalf. He essentially stated that he never made the statement regarding the Sepmeyer murder, but that he signed a number of documents because he was threatened by the police. He also indicated that he confessed to being a perpetrator of the crime for which Lawrence and Harris were convicted because they "made threats" on his life.

Since no question is raised as to a reasonable doubt of defendant's guilt, further facts will be recited only where necessary to a disposition of the issues.

Defendant first contends that he was deprived of his right to a speedy trial in violation of section 103—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a)). This section provides, in relevant part:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant ***."

On January 18, 1980, and for some time prior thereto, defendant was in custody in the St. Clair County jail await-

ing trial and sentencing on certain pending murder charges. On that date, pursuant to a writ of *habeas corpus ad prosequendum,* the sheriff of St. Clair County brought defendant to Madison County, where he was served with an arrest warrant for the instant offense. That same day defendant was arraigned, a preliminary hearing was held, and an attorney was appointed to represent him. A demand for a speedy trial was filed, and the trial date was set for March 3, 1980. Defendant was then returned to St. Clair County.

For reasons not revealed in the record, the trial was rescheduled for April 29, 1980. Defendant appeared, in the custody of the St. Clair County sheriff, again pursuant to a writ of *habeas corpus ad prosequendum.* He indicated that he was ready for trial, but the State refused to proceed. Defendant was returned to St. Clair County. The prosecutor subsequently informed the judge that he would not prosecute defendant until the trials in St. Clair County were completed.

On December 5, 1980, proceedings on the final pending charge in that county were concluded, and defendant was transferred to Menard Correctional Center. A writ of *habeas corpus ad prosequendum* was issued, directing the warden at Menard to bring defendant to Madison County for trial on March 9, 1981. Pretrial motions were filed on that date, and the trial commenced on March 12, 1981.

There is no question that the 120-day period prescribed in section 103—5(a) commences to run on the date defendant is taken "in custody" for the offense for which discharge is sought. (*People v. Woodruff* (1981), 88 Ill. 2d 10; *People v. Jones* (1965), 33 Ill. 2d 357.) The State argues that defendant was not in custody for the instant offense until December 5, 1980, when the proceedings in St. Clair County were concluded. Defendant, relying on this court's decision in *People v. Fosdick* (1967), 36 Ill. 2d 524, contends that he has been in custody since January 18, 1980,

"when he was first brought to Madison County on a writ of *habeas corpus ad prosequendum* and served with an arrest warrant for the Madison County charge." We disagree and find defendant's reliance on *Fosdick* misplaced.

In that case, after a complaint was filed in Champaign County charging the defendant with rape, he was arrested in De Witt County on unrelated charges. He escaped from custody, was apprehended by Federal agents, and placed in the Champaign County jail. Defendant was subsequently arrested on the Champaign County warrant and served with a copy of the rape complaint. However, Champaign County then voluntarily dismissed the charge, allowing defendant to be returned for trial in De Witt County, and immediately filed new, but identical charges against him. In determining that defendant was in custody, on the Champaign County charge, from the date on which he was served with the arrest warrant, this court stated:

"Neither the dismissal and refiling of the same charge, (*cf. People v. Patheal,* 27 Ill. 2d 269; *People ex rel. Nagel v. Heider,* 225 Ill. 347,) nor the voluntary relinquishment of custody to DeWitt County, (*cf. People v. Swartz,* 21 Ill. 2d 277), can deny defendant his right to a speedy trial. It is clear in this case that defendant's removal to DeWitt County did not prevent his trial in Champaign County within 120 days of his original incarceration." 36 Ill. 2d 524, 528.

The holding in *Fosdick* was therefore based on the fact that Champaign County voluntarily relinquished custody of the defendant to another county and attempted to evade the provisions of the 120-day rule by refiling an identical charge. In the instant case, Madison County did not voluntarily relinquish custody of defendant. He was already in the custody of St. Clair County authorities, who were under no duty to postpone proceedings so that he could be prosecuted on the Madison County charge. Although defendant was twice brought to Madison County pursuant to a writ of *habeas corpus ad prosequendum,* the sheriff of

St. Clair County never released custody of defendant to Madison County. This court has indicated that the application of *Fosdick* is limited to its facts (see *People v. Bixler* (1971), 49 Ill. 2d 328, 335), and there is no basis for extending the rationale expressed therein to the instant case.

We are not referred to, nor does our research reveal, any other supreme court cases which have considered the application of the 120-day rule when unrelated charges are pending against a defendant in different counties. However, the vast majority of appellate court decisions resolving the issue have stated that where a defendant "is in custody awaiting trial in one county and there is a charge pending against him in another county, *** he cannot be deemed to be in custody for the latter offense until such time as the proceedings against him in the first county are terminated and he is then returned to, or held in custody for, the second county." (*People v. Clark* (1968), 104 Ill. App. 2d 12, 20; see also *People v. Hatch* (1982), 110 Ill. App. 3d 531; *People v. Gardner* (1982), 105 Ill. App. 3d 103; *People v. Wentlent* (1982), 109 Ill. App. 3d 291; *People v. Kerley* (1979), 72 Ill. App. 3d 916; *People v. Evans* (1979), 75 Ill. App. 3d 949; *People v. Karr* (1979), 68 Ill. App. 3d 1040.) This principle has been recognized even where defendant has appeared before the court in the second county, but is subsequently returned to the first county for further proceedings. 109 Ill. App. 3d 291; 105 Ill. App. 3d 103; 75 Ill. App. 3d 949 (*dicta*).

We agree with the holding of these cases, and adopt the rationale expressed in *People v. Clark:*

"Any other construction would embarrass and harass the effective administration of criminal justice and would tend to favor an accused who is in custody of one county for a crime, but has formal charges pending against him, for which hold or detainer orders have been placed in several counties. Such an absurd result could not have been intended by the legislature when section 103—5(a) was enacted. Further, it would seem that if one county is

to be allowed 120 days in which to prosecute an accused who is in custody for an alleged offense, another county should have an equal amount of time, notwithstanding that its charge against the same accused has been concurrently pending while the case in the first county was being disposed of." (104 Ill. App. 2d 12, 20.)

It should also be noted that where an accused is in custody upon more than one charge in the same county, the State is given additional time in which to proceed with the prosecutions. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a).) It would therefore be anomalous to conclude that separate charges in different counties must all proceed to trial within 120 days.

Accordingly, we hold that defendant was not "in custody" for the instant offense until December 5, 1980, when the proceedings against him in St. Clair County were concluded. Since the trial commenced on March 12, 1981, 120 days had not lapsed and defendant was not deprived of his right to a speedy trial.

It is next argued that, because of an alleged conflict of interest, defendant was denied effective assistance of counsel. This contention is based on the fact that Mr. Kinder, who represented defendant during the guilt and innocence phase of his trial, was a personal friend of an individual for whose murder defendant is allegedly responsible.

Prior to the second phase of the sentencing hearing, a conference was held between the judge, Mr. Kinder, Mr. Bateman (who represented defendant at the first stage of the sentencing hearing), and the State's Attorney. Defendant was not present. Mr. Kinder informed the judge that he recently learned the State intended to introduce, as an aggravating factor, evidence that defendant murdered Mr. James Perdue. He further indicated that he and Perdue were "close personal friends," and he therefore did not believe that he could continue to represent defendant. Mr. Kinder then stated:

"[T]he very first day that I met Mr. Davis and interviewed him preparatory to the original trial, I explained to him who I was, my relationship with Mr. Perdue. And I wanted him to understand that I didn't have very good feelings toward him as a result of that particular case, and that if that case comes up, I would not defend him on it. I would rather see him convicted. And I just have a feeling that this prejudices the defendant."

When asked by the State's Attorney how defendant responded, Mr. Kinder stated: "Then he said, Well, go ahead. I told him we're not on that case. So, I don't mind handling this one for you, but on that one, I won't represent you. And he seemed to understand that." The judge did not verify with defendant Mr. Kinder's statements. There is, however, nothing in the record which indicates that defendant was not aware of the alleged conflict.

Mr. Bateman, who related that he was not acquainted with Perdue, represented defendant during both phases of the sentencing hearing. Mr. Kinder did not participate in either phase of the sentencing proceedings, although, during the first phase of the hearing, he conferred with Mr. Bateman concerning the case during "noon hours and over the telephone."

Defendant cites a number of cases for the proposition that Mr. Kinder's relationship with Perdue created a *per se* conflict of interest, thus justifying reversal without a showing of any prejudice. (*People v. Fife* (1979), 76 Ill. 2d 418 (counsel was affiliated with the Attorney General); *People v. Coslet* (1977), 67 Ill. 2d 127 (counsel represented both the defendant, who was charged with murdering her husband, and the administrator of the husband's estate); *People v. Kester* (1977), 66 Ill. 2d 162 (counsel represented defendant on a case in which he was earlier involved as a prosecutor); *People v. Stoval* (1968), 40 Ill. 2d 109 (counsel represented defendant after representing the owner of a store defendant was charged with burglarizing).) However, each of these cases involved a conflict in professional, not

personal, relationships. "Only in those instances where the conflict arose in counsel's *professional* relationships and obligations have the past decisions of this court dispensed with the requirement that prejudice be shown." (Emphasis added.) (*People v. Lewis* (1981), 88 Ill. 2d 429, 438.) This is simply because we have "deemed it inadvisable to subject an attorney to the ordeal of attempting to fairly discharge conflicting professional obligations to different clients." 88 Ill. 2d 429, 440.

The instant case does not involve a conflict in counsel's professional commitments, and the rationale underlying the *per se* rule is inapplicable. Where personal relationships are at issue, we must presume that an attorney will not undertake to represent a defendant if his professional duty will be hampered by emotional ties. Consequently, we decline, as we have in the past (see *People v. Lewis* (1981), 88 Ill. 2d 429), to extend the application of the *per se* rule beyond conflicting professional relationships.

In so holding, we find *People v. Williams* (1982), 93 Ill. 2d 309, relied on by defendant, inapposite. There, we reversed the defendant's conviction without a showing of prejudice when it was discovered that his counsel, at the time of trial, was the subject of disciplinary proceedings; that he could possibly be jailed for contempt of court; and that he might be required to sell his home to satisfy a civil judgment. However, the issue in *Williams* concerned incompetency of counsel; there was no allegation that the attorney labored under a conflict of interest.

Because the facts in the instant case do not establish a *per se* conflict of interest, it is incumbent upon the defendant to demonstrate prejudice in order to obtain a new trial. This he has failed to do. We are referred to no instances in which counsel presented anything other than a vigorous defense. To the contrary, our review of the record indicates that both Mr. Kinder and Mr. Bateman did all they could for defendant, given the overwhelming evidence against

him. For example, numerous motions were filed and vigorously argued, including motions to suppress statements and evidence; motions to declare the death penalty statute unconstitutional; motions to exclude certain evidence; discovery motions; a motion to dismiss on the grounds defendant's right to a speedy trial was violated; a motion to sever defendant's and Holman's trial; and a motion for a mistrial. The State's witnesses were cross-examined as effectively as possible given the facts, and objections were frequently made to the testimony, evidence and instructions.

We find that defendant was ably and competently represented at all stages of the proceedings, and there is nothing in the record from which prejudice could be inferred. Since the alleged conflict was not manifested at trial, it is unnecessary to address defendant's related contention that he did not "knowingly and intelligently" waive the supposed conflict.

It is next argued that the State failed to establish defendant voluntarily made certain statements indicating his complicity in a number of murders, and other offenses. The circumstances under which defendant allegedly made the statements regarding the Sepmeyer murder were testified to in detail during a pretrial suppression hearing.

James Lay, a detective with the St. Clair County sheriff's department, stated that, pursuant to defendant's request, he met with him in the St. Clair County jail at approximately 10 p.m. on September 9, 1979. Alva Busch, a crime-scene technician with the Illinois Department of Law Enforcement, was also present. At the commencement of the interview, defendant handed Lay a list of 11 offenses in which he claimed involvement. Prior to any questioning regarding the offenses, defendant was shown a form listing the *Miranda* warnings, and he was advised of these rights. Defendant indicated that he understood his rights, and signed the waiver form. He further stated that he had

an attorney but did not wish him to be present.

The witness also testified that he drew a sketch, at defendant's direction, of the interior of the Sepmeyer residence. Various crimes were discussed, but no formal statements were taken. At approximately midnight, Lay requested that defendant accompany him and Busch to locations at which certain offenses occurred. Defendant agreed, and they visited various crime scenes for approximately three and a half hours. Upon arriving in the vicinity of the Sepmeyer residence, defendant pointed to the house and stated, "There it is, right there." He then showed Lay where he had parked his car at the time of the offense.

Subsequently, food was purchased for defendant and he was returned to the jail to eat. A second interview then took place, prior to which defendant was again advised of the *Miranda* warnings. He indicated that he understood his rights and signed a waiver form. Additional evidence showed that defendant dictated a six-page statement detailing the circumstances of the Sepmeyer murder.

During cross-examination, Lay stated that he and Busch met with two other police officers while visiting the crime scenes. He did not hear the officers make any threats or promises to defendant. He further testified that at one location he met and conversed with Gregory Mitchell, whom he knew to be a "fence." Mitchell informed him that he had previously purchased guns from both defendant and Holman. Defendant then spoke with Mitchell and told him to give Lay the guns which he had sold him.

The witness also stated that defendant was awake during the entire trip but that he did not give any statements and no notes were made of any conversation which took place. He admitted that the time noted on the interview form, indicating the duration of the questioning, had been altered. He did not recall what time was originally recorded.

Alva Busch also testified and essentially corroborated

Lay's testimony. However, he did not recall defendant making any comments concerning the Sepmeyer residence, except that he pointed it out while they were driving in the vicinity. On cross-examination, he stated that he knew the location of the Sepmeyer residence prior to September 10, 1979, but that he did not "lead" defendant there. He indicated that defendant did not sign any statements during the ride.

Robert Sabo, a deputy sheriff in St. Clair County, stated that he saw defendant at 1 a.m. on the morning of September 10, 1979. He did not threaten defendant, and none of the officers present intimidated or harassed him.

Ed Muzzey, an agent with the Department of Law Enforcement, testified that he interviewed defendant on September 10, 1979, at approximately 4 a.m. Defendant was advised of his *Miranda* rights and stated that he understood them. He initialed and signed the *Miranda* form, after which he dictated to Muzzey the statement regarding the Sepmeyer murder. Defendant signed each page of the statement. Finally, the witness testified that the interview commenced at 3:57 a.m., but that he had inadvertently recorded the time, on the interview form, as 4:57 a.m.

On cross-examination, Muzzey stated that defendant was given an opportunity to read his statement, but he was uncertain whether he actually did. He also indicated that he was aware of the circumstances of the Sepmeyer murder prior to talking with defendant.

Defendant testified on his own behalf at the suppression hearing. He stated that, during the evening of September 9, 1979, Lay and Busch forced him to leave the jail in shackles and handcuffs. They brought him to various locations, and inquired as to whether he knew anything about certain crimes. He further testified that he fell asleep during the ride, and the officers awakened him upon arriving at a residence in Madison County. They asked whether he recognized the home, and he said that he did not.

Defendant also stated that other officers joined them at one of the crime scenes. Defendant was taken from the squad car, and his leg shackles were removed. An officer then placed a number of documents on the hood of the car, and defendant was told to sign the papers "or run." One of the officers suggested that they kill him, and defendant, afraid that he would otherwise be shot, signed the documents.

Further suppression hearings were conducted during the course of the sentencing proceeding. These hearings related to statements defendant purportedly made indicating his complicity in certain other murders. A number of officers testified, for the State, that defendant was informed of, and waived, his *Miranda* rights prior to dictating the statements. The witnesses stated that defendant appeared coherent at all times; that he voluntarily cooperated with the authorities; that he did not request the presence of an attorney; and that he was never threatened or coerced. Defendant's testimony at the pretrial suppression hearing was stipulated into evidence at the subsequent hearings.

On the basis of the above-related testimony, the trial court found that defendant voluntarily made the inculpatory statements. It is well established that " '[t]he finding of the trial court on the voluntariness of a confession will not be disturbed unless it can be said that it is contrary to the manifest weight of the evidence.' " (*People v. Davis* (1983), 95 Ill. 2d 1, 25, quoting *People v. Brownell* (1980), 79 Ill. 2d 508, 521, *appeal dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59; *People v. Medina* (1978), 71 Ill. 2d 254, 258.) Here, a question of credibility was clearly involved, and the trial judge was not required to believe defendant's version of events. There was absolutely no evidence corroborating his claim that he was coerced, by police threats, into making the statements. Neither the minor inconsistencies in certain officers' testimony, nor the

altered numbers on the interview forms, raise a doubt as to the voluntariness of defendant's statements. We therefore conclude that the trial court did not err by allowing them into evidence. See *People v. Davis* (1983), 95 Ill. 2d 1, 25.

Defendant next asserts that he was denied his sixth amendment right to confrontation by the admission into evidence of Holman's statement concerning the Sepmeyer murder. Because Holman would not testify and could not, therefore, be subject to cross-examination, defendant made a motion *in limine,* in the trial court, to exclude the statement as evidence against him. The trial judge denied the motion but stated that he would disregard that portion of the statement which related that defendant shot the victim.

In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, primarily relied upon by defendant, the Supreme Court held that a codefendant's confession, implicating the defendant, is not admissible in evidence where the codefendant does not take the stand and is not subject to cross-examination. However, the other evidence against Bruton was weak, and he had made no inculpatory statements. Both the Supreme Court and this court have subsequently determined that *Bruton* does not require "reversal of a defendant's conviction when the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant." *Parker v. Randolph* (1979), 442 U.S. 62, 64, 60 L. Ed. 2d 713, 718, 99 S. Ct. 2132, 2135; *People v. Rosochacki* (1969), 41 Ill. 2d 483.

In the instant case, Holman's statement was substantially similar to the one given by defendant and cannot be said to have added "substantial, perhaps even critical, weight to the Government's case." (*Bruton v. United States* (1968), 391 U.S. 123, 128, 20 L. Ed. 2d 476, 480, 88 S. Ct. 1620, 1623.) The only significant difference between

the two statements is that Holman indicated that defendant actually shot the victim. As previously related, the trial judge, sitting as the trier of fact, clearly stated that he would not consider this portion of the statement as evidence against defendant. Under these circumstances, the admission into evidence of Holman's statements did not constitute reversible error.

Having determined that no reversible error occurred during the guilt or innocence phase of defendant's trial, we next consider allegations of error at the sentencing proceeding. Defendant raises two contentions concerning the constitutionality of the death penalty statute which have been resolved. This court has determined that the statutory grant of discretion and authority to the prosecutor is proper (*People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Brownell* (1980), 79 Ill. 2d 508; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603); and that the statute adequately guides the jury's discretion in determining when the death penalty may be imposed. See *People v. Davis* (1983), 95 Ill. 2d 1; *People v. Jones* (1982), 94 Ill. 2d 275; *People v. Brownell* (1980), 79 Ill. 2d 508.

It is also argued that the death penalty statute is unconstitutional because it "arbitrarily and capriciously limits imposition of the death sentence to English speaking people." Defendant points out that people who require translators, or other special assistance at trial, may not be subject to the death penalty. (See Ill. Rev. Stat. 1981, ch. 38, pars. 104—22(b), 104—26(b).) Since defendant does not directly challenge the constitutionality of these provisions, we express no opinion as to their validity. Nevertheless, he argues that section 104—26(b) exempts non-English-speaking people from being sentenced to death. Therefore, the death penalty provided under section 9—1(b) may not be constitutionally imposed upon English-speaking people.

The provisions relied upon by defendant are of no avail

since they were not in effect at the time the instant offense was committed. The governing law must exist at the time of the offense, and unless there is "an express statutory provision stating an act is to have retroactive effect, it can only be applied prospectively." *Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 18; see also *Johnson v. Franzen* (1979), 77 Ill. 2d 513; *Stigler v. City of Chicago* (1971), 48 Ill. 2d 20; *People ex rel. Schmidt v. Yerger* (1961), 21 Ill. 2d 338; *Voigt v. Kersten* (1896), 164 Ill. 314; 2 A. Sutherland, Statutory Construction sec. 41.04, at 252 (1973).

Defendant next argues that the death sentence may not be imposed where his murder convictions, used to establish a statutory aggravating factor, may have been premised upon a theory of accountability. This court has recently rejected this contention, stating that "[i]f the legislature intended that the death penalty not be imposed on those who were personally present but did not actually kill in every case, it could have so provided. *** [A]ccountability is not incompatible with the death penalty in cases other than felony murders." *(People v. Ruiz* (1982), 94 Ill. 2d 245, 261.) In the instant case, as in *Ruiz,* the jury determined that defendant was eligible for the death penalty because he was convicted of murdering two or more individuals. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).

In a related contention, it is argued that defendant may not be sentenced to death unless he planned or intentionally participated in the murders. *(Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368; *People v. Tiller* (1982), 94 Ill. 2d 303.) Here, the jury was informed that defendant was convicted of four separate, unrelated murders in which the evidence establishes he was an active participant.

Testimony at the first stage of the sentencing hearing revealed that defendant *was* the actual "triggerman" in the murder of one of the victims, Frank Cash. (Defend-

ant's conviction in that case was premised on an intent-to-kill theory.) In the instant case, according to defendant's own statement, he obtained and loaded the rifle with which Holman shot the victim. Similarly, he admitted to obtaining the knife with which he claims Holman stabbed another victim, John Oertel.

Defendant's fourth murder conviction was for the shooting death of Charles Biebel. Evidence indicates that Holman was the actual triggerman, but that defendant actively participated in the burglary during which the murder occurred. It should be mentioned that this court recently affirmed defendant's death sentence imposed for this murder, noting that "defendant certainly had reason to contemplate that a life would be taken, or that lethal force would be employed." (*People v. Davis* (1983), 95 Ill. 2d 1, 52; see also *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368.) The same reasoning applies here with equal force. Indeed, according to the uncontradicted testimony of police officer James Lay, defendant stated that the victims were murdered to assure that he would not be identified. For these reasons, we hold that the jury could properly determine defendant was eligible for the death penalty pursuant to section 9—1(b)(3).

It is further alleged that the prosecutor, during his opening and closing statements in the first phase of the sentencing hearing, improperly argued facts upon which no evidence was produced. The prosecutor informed the jury that defendant confessed to killing Sepmeyer and Biebel when, in fact, defendant had maintained that Holman actually shot the victims.

Defendant failed to make a timely objection to these statements at trial and did not raise the issue in his post-trial motion. Objections not raised at the trial level are normally waived on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564.) Further, defendant did admit to extensive participation in the offenses. His statements were presented to

the jury, affording it an opportunity to determine first hand defendant's version of the events. Other evidence indicated that defendant claimed Holman was the actual "triggerman." Finally, the jury was clearly instructed to disregard any arguments which were not based upon the evidence. We therefore cannot conclude that the isolated comments resulted in "substantial prejudice" to defendant. See *People v. Tiller* (1982), 94 Ill. 2d 303; *People v. Baptist* (1979), 76 Ill. 2d 19.

The next assignment of error concerns the fact that, during the first phase of the sentencing hearing, the jury was informed defendant had previously received the death penalty for the unrelated murder of Charles Biebel. In order to establish the necessary aggravating factor that defendant had murdered two or more individuals, the State introduced into evidence certified copies of defendant's murder convictions in the Sepmeyer, Cash, Oertel and Biebel cases. The copy of his conviction in the latter case stated that the jury sentenced defendant to death. The clerk's minute docket, also introduced into evidence, contained the jury's verdict relating to the Biebel offense, which stated:

> "We, the jury, unanimously find beyond a reasonable doubt, that the defendant GIRVIES DAVIS had attained the age of 18 or more at the time that he committed the offense of murder. We further unanimously find beyond a reasonable doubt that the following statutory aggravating factor exists in relation to this offense: The defendant has been convicted of murdering two or more individuals under the law of this State prohibiting murder regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts.
>
>            \*     \*     \*
>
> We unanimously conclude that there are no mitigating factors sufficient to preclude the imposition of the death sentence upon the defendant GIRVIES DAVIS and

that the Court shall sentence the defendant to death."

This verdict form is substantially similar to that which the jury returned in the instant case.

The State argues that evidence of defendant's prior death sentence was properly before the jury since, in a capital case, the focus should be on both the character and record of the accused. (*Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).) This argument ignores the significant fact that the evidence in question was introduced during the first phase of the sentencing hearing. At this time the question for the jury to determine is whether, on the basis of a statutory aggravating factor, defendant is *eligible* to receive the death sentence; not whether, in light of his character or record, he *should* receive this penalty. That defendant received the death sentence for a prior murder has absolutely no relevance to the issue of whether he is eligible to receive that penalty for the instant offense.

More importantly, as noted by defendant, introduction of this evidence may well have improperly influenced the jury's decision in two respects. In determining his eligibility for the death penalty, the jury was aware that another jury had previously resolved the identical issue adversely to defendant. If a juror was uncertain as to whether defendant was qualified for the death sentence, the knowledge that 12 other people determined he was could have swayed the juror's verdict in favor of death.

Further, the jury's awareness of defendant's prior death sentence would diminish its sense of responsibility and mitigate the serious consequences of its decision. Assuming that defendant was already going to be executed, the jurors may consider their own decision considerably less significant than they otherwise would.

In a capital case, "a high standard of procedural accu-

racy is required in determining whether or not [the death] penalty will be imposed." (*People v. Walker* (1982), 91 Ill. 2d 502, 517.) The possibility that the jury may have found defendant eligible for this penalty on the basis of an irrelevant and prejudicial nonstatutory aggravating factor should not be tolerated. Although this error alone is sufficient to warrant reversal of defendant's death sentence, it is combined with other errors which mandate that defendant receive a new sentencing hearing.

Also during the first phase of the sentencing proceeding, the State introduced evidence that a murder victim's wife delivered a baby the day after his death. This evidence was elicited through the testimony of Mr. Ostman, an attempted-murder victim. During his direct examination, the following colloquy took place:

"Q. Is there any possibility that someone else could have shot Frank Cash other than Davis?

A. No, Sir.

Q. Do you know when Cash's wife had her baby?

A. Yes, sir.

Q. When was that?

A. It would have been the day after he was killed."

This evidence was also briefly referred to in the prosecutor's opening and closing arguments. Although objections were not registered to the testimony or comments, we believe the issue should be addressed. See *People v. Free* (1983), 94 Ill. 2d 378, 425 (wherein this question was addressed although defendant did not object to the evidence at trial).

There is no question that evidence regarding a deceased's family is generally improper. "[T]his court has consistently condemned the admission of evidence that the deceased left a spouse and a family, inasmuch as such evidence has no relationship to the guilt or innocence of the accused *or the punishment to be inflicted upon him,* but serves ordinarily only to prejudice him in the eyes of the jury." (Emphasis added.) (*People v. Bernette* (1964), 30 Ill.

2d 359, 371.) The State's argument that the traditional rules of evidence do not apply during the second phase of the sentencing proceeding is inapposite since, here, the evidence was introduced during the *first* phase of the hearing. But *cf. People v. Davis* (1983), 95 Ill. 2d 1 (evidence regarding a deceased's family is not necessarily reversible error where it is introduced during the second phase of the sentencing hearing); *People v. Free* (1983), 94 Ill. 2d 378 (same principle).

We recognize that, as the State points out, evidence regarding a victim's family has occasionally been considered harmless error. (See *People v. Wright* (1974), 56 Ill. 2d 523; *People v. Jordan* (1967), 38 Ill. 2d 83.) This principle should not be applied during the first phase of the sentencing hearing in a capital case. Here, in particular, it is essential that the jury's determination be based upon competent evidence, uninfluenced by the prejudice and passion potentially evoked by evidence of this nature.

Further, in this phase of the sentencing proceeding, during which the ordinary rules of evidence apply, the prosecutor introduced into evidence photographs depicting Charles Biebel following his death. Also presented to the jury was a blood-stained shirt which was worn by Frank Cash at the time of his murder. Defendant contends that the photographs and shirt should not have been admitted into evidence because their probative value was outweighed by the prejudicial effect upon the jury. Under the circumstances of this case, we agree.

As previously noted, certified copies of defendant's convictions for the Biebel and Cash murders were introduced into evidence. The jury heard testimony regarding defendant's extensive participation in the Cash murder. His written statement describing the circumstances of the Biebel shooting was also introduced and corroborated through testimony elicited from the State's witnesses. Consequently,

the fact that defendant participated in the commission of two or more murders, as required by section 9—1(b)(3), was more than adequately established without introduction of the evidence in question.

The State, however, contends that it was required to prove, under section 9—1(b)(3), that defendant intended to kill the victims. It is alleged that admission into evidence of the photographs and shirt was necessary to establish that the death resulted from intentional or premeditated acts. We note initially that, in *People v. Davis* (1983), 95 Ill. 2d 1, this court determined that the death penalty may also be imposed where the death resulted from knowing as well as premeditated or intentional acts.

Further, we do not consider the evidence probative of defendant's mental state at the time of the offenses. The fact that Cash's shirt was blood-stained does not prove whether or not he was shot intentionally. Nor does the photograph depicting Biebel in his wheel chair with a blood stain on his overalls necessarily establish defendant's state of mind at the time of the offense. Because we believe that the probative value of this evidence was minimal, it should not have been introduced during the first phase of the sentencing hearing.

Since a new sentencing hearing is required, we find it unnecessary to address defendant's final contentions. We assume that any alleged errors will not recur during the new hearing.

Accordingly, the judgment of conviction of murder is affirmed; the judgment sentencing defendant to death is vacated; and the cause is remanded to the circuit court of Madison County for further proceedings consistent with this opinion.

*Judgment affirmed; sentence*
*vacated; cause remanded.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the reversal of the sentence of death and in the remand of the cause to the trial court. However, a serious error occurred at the guilt phase of the trial which compels me to dissent from the majority's denial of defendant's request for a new trial. I would also hold that, on the basis of the evidence offered in this case, the death penalty may not be considered in the new sentencing hearing which the majority has ordered. In addition, I believe, as I have previously stated, that our death penalty statute is unconstitutional and cannot for that reason be imposed.

## I. THE GUILT PHASE

Bill Kinder, Girvies Davis' appointed attorney through the guilt phase of the instant proceedings, was a "close personal friend" of James Perdue, for whose murder the State eventually claimed Mr. Davis was responsible. Mr. Kinder was aware from the outset that the State might sooner or later attempt to link the defendant to the Perdue murder, as he made clear to the defendant when he first saw him and later to the trial judge. More significantly, however, Mr. Kinder seems to have entertained no doubt that his client had been responsible for that murder; as he himself stated, he told Girvies Davis when he first met him "if that case comes up, *I would not defend him on it. I would rather see him convicted.*" (Emphasis added.)

It is unclear from the record what caused Mr. Kinder to be so certain that defendant was the murderer in the Perdue case, or when he arrived at that conclusion. As of the time the sentencing hearing in the case at bar began, no prosecution for the Perdue murder had been commenced; in fact, the State had indicated to Mr. Kinder at one point that it did not intend to press charges against defendant in the Perdue case. Nonetheless, Mr. Kinder's belief that his client was responsible for the murder of his friend was ap-

parently so strong that he wished to see him convicted of that murder without further inquiry into the truth. This strikes me as an attitude not compatible with a court's selection of an attorney to provide representation to a defendant, and it is, in my opinion, an indication of a conflict of interest so fundamental as to warrant a reversal without a showing of actual prejudice.

The majority attempts to avoid the impact of cases which hold that dual representation of a criminal defendant and a party with potentially adverse interest is a *per se* conflict of interest in violation of the sixth and fourteenth amendments (*e.g., Wood v. Georgia* (1981), 450 U.S. 261, 67 L. Ed. 2d 220, 101 S. Ct. 1097; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *Porter v. United States* (5th Cir. 1962), 298 F.2d 461; *People v. Fife* (1979), 76 Ill. 2d 418; *People v. Coslet* (1977), 67 Ill. 2d 127; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Stoval* (1968), 40 Ill. 2d 109) by asserting that the rule prevails only where there exists a dual representation. It does not serve the ends of justice to limit the rule in that fashion. *People v. Lewis* (1981), 88 Ill. 2d 429, the only case pointed to by the majority in this regard, offers little support for applying this sweeping proposition to this case. The attorney in *Lewis* expressed confidence in his ability to represent the defendant throughout her trial, unlike Mr. Kinder, whose most explicit statement on the subject was that he preferred to see the defendant convicted of a murder although not the one for which he was being tried; and, as I noted in my concurrence in *Lewis,* the victim in that case was at most an arm's length acquaintance of the attorney as a result of professional contacts and was clearly not a "close personal friend."

Lawyers are not supermen possessed of a supreme ability to overcome all the obstacles their personal life may create for them. Human nature tells us that someone who is convinced that another person has killed a close friend

will not feel kindly toward that person, and that while he may wish earnestly and in the best of faith to overcome that feeling he may be unable to do so subconsciously even though he succeeds in doing it in every visible respect. We as judges should be aware, however, that a trial consists of more than filing motions, presenting evidence, and raising objections. Subconscious feelings may surface at trial despite the best efforts of an attorney to suppress them, and even without his knowledge; they may manifest themselves in a number of ways that influence the fact finder yet are invisible to a reviewing court perusing a record. For that reason, courts see it as a futile exercise to pore through records in cases where a potential conflict of interest is apparent. Rather than searching for what probably cannot be found, and rather than allowing a criminal conviction to stand under these circumstances, they remand the cause and permit the parties to begin afresh. See *Wood v. Georgia* (1981), 450 U.S. 261, 67 L. Ed. 2d 220, 101 S. Ct. 1097.

I believe that the situation here was "too fraught with the dangers of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of [defendant's] rights whether or not it in fact influences the attorney or the outcome of the case." (*People v. Stoval* (1968), 40 Ill. 2d 109, 113; see *United States ex rel. Miller v. Myers* (E.D. Pa. 1966), 253 F. Supp. 55, 57.) In any event I regard the appearance of impropriety as overwhelming, and that alone should prevent us from letting this conviction stand.

## II. THE SENTENCING HEARING

I adhere to the belief, which I stated in my dissent in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), that the Illinois death penalty statute which is the basis for imposing capital punishment in this State is invalid. In addition I adhere to that belief because a majority

of the current members of this court have viewed it as unconstitutional. However, even if the statute were constitutional, I do not believe that, on the basis of the evidence so far presented in this case, Girvies Davis is a candidate for the death penalty under its terms.

Our death penalty statute nowhere provides that accountability alone may be the basis for capital punishment. At most, in the context of this case, it permits a sentence of death if "the defendant has been convicted of murdering two or more individuals *** regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) or if the victim was killed in the course of another felony "if *** the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)). It allows the jury to consider as a mitigating factor the defendant's absence from the scene of the murder during the "commission of the act or acts causing death" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(5)). In this case, there is no finding that Girvies Davis was on the scene while Esther Sepmeyer was killed. His testimony was that he was carrying items out of her house when his accomplice fired the fatal shots; the verdict of guilt, reached by a circuit judge in a bench trial, contains no indication that it was based on anything but a vicarious theory of murder and was in no respect at odds with the defendant's version of events. The mitigating factor I mentioned above would therefore have applied, and the aggravating factor concerning murders committed in the course of a felony would not have.

The majority notes that the defendant was convicted of four murders and finds him potentially eligible for the death penalty based on the aggravating factor concerning

two or more murders (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)). However, that factor requires either an "intent to kill more than one person" or "separate premeditated," murderous acts. Only one of the defendant's murder convictions, that for the killing of Frank Cash, involved a finding of intent to kill. The convictions for the murders of Charles Biebel and John Oertel were both premised at least in part on accountability or felony-murder instructions, which do not require an intent to kill (a fact made clear to the jury in the prosecutor's closing argument in the Biebel case), and provide no basis for finding that defendant intended to kill in either of these cases. Under the terms of the statute, aggravating factors must be proved beyond a reasonable doubt (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(f)), and the record falls far short of showing that the defendant intended to kill more than one person.

Moreover, I disagree with the idea that the act of removing stolen items from a house, as the defendant testified he was doing when each murder took place, is a separate, "premeditated" act within the meaning of the aggravating factor at issue here, or that either it or the act of loading a gun found in the house and handing it to a burglary accomplice constitutes a "*** 'contemplat[ion] that a life would be taken, or that lethal force would be employed' " (97 Ill. 2d at 24) sufficient to call that aggravating factor into play. Defendant's statement to the police, which was not contradicted by the finding of guilt in this case in view of the evidence of guilt by accountability that was present, was that he warned his comrade *not* to kill Esther Sepmeyer. In addition, even if we were to assume that it was *foreseeable* to the defendant that his companion might commit a murder while he was out of the house, or even that he "contemplate[d]" that such a killing would occur, to use the majority's language, that alone is not murderous conduct on the part of the defendant, and it would not constitute an aggravating factor under the death pen-

alty statute or any other provision of the criminal code. The death penalty statute makes no mention of foreseeability or contemplation of a death; it does not equate contemplation that a life would be taken with intent to take a life. The only section of the death penalty statute which could apply to such conduct speaks of "intent" and "premeditat[ion]" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)), both of which imply an element of volition, while the criminal code explicitly distinguishes "intent" (Ill. Rev. Stat. 1979, ch. 38, par. 4—4) from "knowledge" (Ill. Rev. Stat. 1979, ch. 38, par. 4—5), "recklessness" (Ill. Rev. Stat. 1979, ch. 38, par. 4—6), "negligence" (Ill. Rev. Stat. 1979, ch. 38, par. 4—7), and other nonvolitional states of mind for the purpose of virtually every crime defined by that code.

So long as the evidence establishes nothing more than that, in the words of the majority of this court, the defendant "had reason to contemplate that a life would be taken, or that lethal force would be employed," the record does not reveal, in my opinion, any aggravating factor sufficient for imposition of a death sentence in this case, and I believe the court should prevent that penalty from being considered on the remand unless additional evidence of intent to kill is offered.