(No. 58462.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDGAR HOPE, JR., Appellant.

*Opinion filed February 21, 1986.*

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport and Robert E. Davison, all of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry and Peter D. Fischer, As-

sistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE CLARK delivered the opinion of the court:

The defendant, Edgar Hope, Jr., and a codefendant, Alton Logan, were charged with murder, attempted murder and two counts of armed robbery stemming from an armed attack on two security guards in a McDonald's restaurant on Chicago's south side. Following a jury trial in the circuit court of Cook County, both defendants were found guilty of the charges against them. Hope had a prior conviction for a murder that had actually occurred subsequent to the murder in the case at bar. He had not yet been arrested for the murder in this case when he committed the subsequent murder. During the sentencing phase of the trial which resulted in his prior conviction, the State had presented evidence of defendant's involvement in the murder in the instant case. The State did not use this evidence as a qualifying factor to support the defendant's eligibility for the death penalty since he already qualified for another reason, but instead used it in the aggravation stage of the sentencing hearing to demonstrate the defendant's alleged propensity to commit criminal offenses. In this case, Hope's prior conviction was used as a qualifying factor making him eligible for the death penalty pursuant to section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3)); therefore, the State requested a death penalty hearing. The jury which convicted the defendant also sat at the sentencing phase. The jury found that the defendant was eligible for the death penalty, that there were the necessary aggravating factors (over the age of 18 and with a prior conviction for murder), and that there were no mitigating circumstances sufficient to preclude the imposition of death. Therefore, Hope was sentenced to death. In his direct appeal before

this court, the defendant alleges that numerous errors occurred throughout the proceedings.

At about 8 p.m. on January 11, 1982, two McDonald's restaurant security guards, Alvin Thompson and Lloyd Wyckliffe, were on duty. Each guard was carrying a firearm. From where Thompson and Wyckliffe were seated they could see customers placing orders. They could also see employees working behind the counter, including the cashier, Antonette Dawson. Shortly after 8 p.m., the security guards noticed a disturbance at Dawson's cash register involving a black male and black female customer. The male was placing large orders with Dawson and then changing the orders. (Thompson, Dawson, and another employee, Charles Trent, later identified Hope as the customer causing the disturbance.)

Dawson motioned to the security guards. They got up and walked toward her. When the security guards were about five feet from the counter where the defendant was causing the disturbance, another man came into the restaurant and yelled something. At this time, Thompson was about three feet from the door and was looking at the man who entered. (At trial, Thompson identified this man as Alton Logan, the codefendant.) Logan then pulled a sawed-off shotgun from under his coat and fired it into Wyckliffe's chest, causing his death.

Hope then knocked Thompson to the floor and pointed a gun at him. Logan took Wyckliffe's weapon, and Hope took Thompson's weapon. Hope told Thompson not to look at him and started to pull the trigger. Thompson raised his left arm to cover his face and turned his head. At this point, Thompson heard the defendant's gun discharge and felt a bullet drive into his left arm. The two perpetrators then ran out of McDonald's.

On February 5, 1982, the defendant was arrested in connection with another murder in which he was alleged to have shot a police officer. The arresting officer testified that he recovered a gun from the defendant at that time. At the trial Thompson then identified that gun as the one that was taken from him at the McDonald's incident. The State connected Hope and Logan to the incident by the identification testimony of the three eyewitnesses, Thompson, Dawson, and Trent, and by testimony which showed that the defendant was in possession of Thompson's stolen gun a few weeks after this incident. Thompson, Dawson and Trent all made in-court, photographic and lineup identifications of the defendants.

In addition to the aforementioned witnesses, the State also called the decedent's wife to testify. She told the jury about their family, the ages of their children, and identified a photograph of the family.

Although the defendant did not testify, his mother testified that she had never seen Logan before the trial, and she described the defendant's appearance, including two prominent scars and his hoarse voice, which were not mentioned by the State's witnesses. Codefendant Logan testified in his own behalf and stated that he was at home at the time of the incident. Other witnesses corroborated his testimony. Logan also testified that he did not know the defendant.

The jury returned verdicts of guilty against both defendants on all charges. Hope and Logan had separate sentencing hearings. At the defendant's sentencing hearing, the jury found that Hope, being over the age of 18 and with a prior conviction for murder, was eligible for the death penalty and that there were not mitigating factors sufficient to preclude the death penalty from being imposed.

Due to our holding in this case we need only address the following issues: (1) whether the defendant was de-

nied a fair sentencing hearing; (2) whether the circuit court erred in allowing the State to introduce evidence concerning the family of the deceased victim; and (3) whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

The defendant argues that he was denied a fair sentencing hearing because two or three jurors had either seen or heard news reports regarding his conviction and death sentence in another case.

The portion of the death penalty statute which is applicable in this case states:

> "A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
> The defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).

Therefore, under this statute, it is permissible for the jury to have knowledge during the sentencing hearing that the defendant was previously convicted of murder. However, it is not permissible that the jury know that due to that conviction he was sentenced to death. See *People v. Davis* (1983), 97 Ill. 2d 1.

At the beginning of the trial, the judge denied the defendant's request to sequester the jury. Instead, the trial judge admonished the jurors not to read or listen to any news media reports concerning the case. However, the judge withdrew his admonishment by stating: "And as far as reading the papers, it won't make any differ-

ence—make any difference now or watching television. Okay. See you tomorrow." This statement came at the sentencing hearing, after two State witnesses had testified, but before seven other State witnesses and the defense witnesses testified.

The following day, February 17, 1983, defense counsel renewed his motion to sequester the jury and requested that an inquiry be made of the jurors to determine if they had been exposed to the news reports indicating that the defendant had a prior death sentence. The inquiry disclosed that some jurors had read or heard the news reports:

"[THE COURT]: Let me ask you did any of you see anything in the newspapers or on television about the case?

Yes? Raise your hand that did. Anybody see anything? Yes, or read anything?

You might have noticed some of the reports were erroneous. That's why I always tell people not to listen to the radio or television because you do get a lot of erroneous reports. You must decide this case strictly upon what you hear in Court, not what you hear in [sic] television because both of it was erroneous and they add things and everything else. Nobody says the news media has to be accurate. They're not accurate. Decide the case on what you heard here because the things you see in the newspapers, a lot of the times, it's wrong."

While defense counsel stated that "approximately four or five jurors" raised their hands in response to the above inquiry, the trial judge stated that "two or three" jurors did so. Thereafter, defense counsel requested that the jurors be questioned individually. The request was denied, and no further inquiry was made of the jurors.

In requesting that an inquiry be made of the jurors, defense counsel pointed out that "all, I believe, all television stations and all major news indicated that Mr. Hope was under a previous death sentence." In support

thereof, counsel submitted as part of the record two newspaper articles from February 17, 1983, which stated that the defendant had a prior death sentence:

> "Hope was sentenced to death in October for the Feb. 5, 1982, murder of police rookie James Doyle, who was gunned down on a crowded CTA bus." (Chicago Sun-Times, Feb. 17, 1983, at 82, col. 2.)

> "Hope already has been sentenced to die in the electric chair for the murder last year of Chicago police officer James Doyle, who was shot to death on a CTA bus on the South Side." Chicago Tribune, Feb. 17, 1983, at 13, col. 1.

Because the news reports contained specific information about the defendant's prior death sentence and because at least two or three jurors read or heard those reports, it is evident that certain jurors had knowledge of the defendant's prior death sentence. The defendant cites *People v. Davis* (1983), 97 Ill. 2d 1, for the proposition that such knowledge is reversible error.

On the other hand, the State argues that such knowledge was admissible in the second stage of a sentencing hearing where the focus is on the character and record of the accused. Thus, the State further alleges that the defendant's citation of *Davis* is "clearly inapposite" to this case. The State asserts that *Davis* only holds that such evidence is inadmissible at the eligibility stage of the sentencing hearing.

In *Davis* the court stated that during the first stage of the sentencing hearing:

> "[T]he question for the jury to determine is whether, on the basis of a statutory aggravating factor, defendant is *eligible* to receive the death sentence; not whether, in light of his character or record, he *should* receive this penalty. That defendant received the death sentence for a prior murder has absolutely no relevance to the issue of whether he is eligible to receive that penalty for the instant offense." (97 Ill. 2d 1, 26.)

The *Davis* court was specifically concerned about the first stage of the sentencing hearing because that is when the evidence was introduced, but a complete reading of *Davis* indicates that such evidence should never be admitted since it went on to state:

> "More importantly, as noted by defendant, introduction of this evidence may well have improperly influenced the jury's decision in two respects. In determining his eligibility for the death penalty, the jury was aware that another jury had previously resolved the identical issue adversely to defendant. If a juror was uncertain as to whether defendant was qualified for the death sentence, the knowledge that 12 other people determined he was could have swayed the juror's verdict in favor of death.
>
> Further, the jury's awareness of defendant's prior death sentence would diminish its sense of responsibility and mitigate the serious consequences of its decision. Assuming that defendant was already going to be executed, the jurors may consider their own decision considerably less significant than they otherwise would." 97 Ill. 2d 1, 26.

Furthermore, in the case at bar, the sentencing hearing was not bifurcated and, thus, the "two or three" jury members utilized their knowledge of Hope's prior death sentence at the entire sentencing hearing—including the eligibility stage.

This court has noted in the past that a high standard of procedural accuracy is required in determining whether or not the death penalty will be imposed. (See *People v. Walker* (1982), 91 Ill. 2d 502.) The possibility that the jury, even one member, may have sentenced the defendant to death on the basis of an irrelevant, highly prejudicial and nonstatutory aggravating factor constitutes reversible error. See *People v. Davis* (1983), 97 Ill. 2d 1.

The second issue is whether the circuit court erred in allowing the State to introduce evidence at the guilt

phase of the trial concerning the family of the deceased. We must determine whether this evidence constituted a prejudicial error depriving the defendant of his constitutional right to a fair trial. If it did, his conviction must be reversed.

A defendant's guilt must be established by legal and competent evidence. This court has consistently condemned the admission of evidence that the deceased left a spouse and a family. Evidence of this nature has no relationship to the guilt or innocence of the accused, but normally serves only to prejudice the defendant in the eyes of the jury. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 453; *People v. Jordan* (1967), 38 Ill. 2d 83, 91; *People v. Bernette* (1964), 30 Ill. 2d 359, 371; *People v. Dukes* (1957), 12 Ill. 2d 334, 340.) From these cases has evolved this maxim:

> "*[W]here testimony in a murder case respecting the fact that the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence.* In like manner we have held that jury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper. *People v. Gregory,* 22 Ill. 2d 601; *People v. Dukes* 12 Ill. 2d 334." (Emphasis added.) (*People v. Bernette* (1964), 30 Ill. 2d 359, 371.)

In *Bernette*, it was also stated, "[T]he irrelevancy and highly prejudicial nature of such evidence is so well established, that it [is] the duty of the court in a murder case to [refuse] it [the evidence] on its own motion." 30 Ill. 2d 359, 372.

However, "[c]ommon sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." (*People v. Free*

(1983), 94 Ill. 2d 378, 415.) Thus, every mention of a deceased's family does not *per se* entitle the defendant to a new trial. (*People v. Bartall* (1983), 98 Ill. 2d 294, 322.) In certain instances, *depending upon how this evidence is introduced*, such a statement can be harmless; this is particularly true when the death penalty is *not* imposed. See *People v. Jordan* (1967), 38 Ill. 2d 83, 91-92.

Therefore, in order to address the issue before us, we must view the evidence that was introduced by the State concerning the family of the deceased victim.

Prior to trial, the defendant's counsel made a motion *in limine* to prohibit the State from presenting evidence concerning the families of the victims; this motion was denied.

Throughout the guilt phase of the defendant's trial, the prosecutor made reference to and elicited testimony regarding the decedent's family. The first reference to the decedent's family was the prosecutor's opening statement:

> "[PROSECUTOR]: [O]n January 11, 1982, two members of our community, a man by the name of Lloyd Wyckliffe and Alvin Thompson, in the early evening hours, left their homes and their families to go to a place of employment."

The second reference to the victim's family was during the prosecutor's direct examination of Wyckliffe's widow. She was allowed to testify over the objection of defense counsel:

> "[PROSECUTOR]: Mrs. Wyckliffe, what did your family consist of on January 11, 1982?
>
> [MR. LOGAN'S COUNSEL]: Objection, your Honor.
>
> [JUDGE]: Overruled.
>
> [MRS. WYCKLIFFE]: Myself and three children and him.
>
> [PROSECUTOR]: And the children's ages?
>
> [MRS. WYCKLIFFE]: The oldest is 10, 6 and 3.

[PROSECUTOR]: And all three were your children, ma'am?

[MRS. WYCKLIFFE]: Yes.

[PROSECUTOR]: And were any of those children stepchildren to your husband?

[MRS. WYCKLIFFE]: Yes, my oldest son.

[PROSECUTOR]: But the remaining two children were children of you and Mr. Wyckliffe?

[MRS. WYCKLIFFE]: Yes.

[PROSECUTOR]: Mrs. Wyckliffe, I hand you what's marked for identification as People's Exhibit Number 1. Ma'am, is that a photograph showing you, your husband, and two of your children and, specifically, your husband as he appeared alive?

[MRS. WYCKLIFFE]: Yes."

The prosecutor did not limit his questions pertaining to the victim's family to the aforementioned, but continued by asking another State's witness to identify the previously cited photograph.

"[PROSECUTOR]: At this time, Mr. Thompson, I show you what's been marked as People's Exhibit Number 1 for identification. Do you recognize what is portrayed in that photograph, sir?

[MR. THOMPSON]: That's Lloyd Wyckliffe, his wife, Vernita, and two of her children."

Not only was the photograph identified by Wyckliffe's widow and Thompson, but it was allowed, over defense counsel's objection, to go to the jury room.

The fourth and final time the prosecutor referred to the decedent's family was in his closing argument:

"[PROSECUTOR]: Little did Lloyd Wyckliffe know that when he said good-bye to his wife, that would be the last time he saw her alive as he went to work."

Examination of the record reveals that the prosecutor's comments were not invited by the defense, and we believe that the testimony regarding the surviving members of the deceased's family was an improper appeal to the emotions of the jurors. The State may comment un-

favorably on the evil effects of crime and urge a fearless administration of the law (*People v. Jackson* (1981), 84 Ill. 2d 350, 360); however, remarks which include intentional references to the victim's family are not permissible. See *People v. Bernette* (1964), 30 Ill. 2d 359.

The evidence concerning the decedent's family was not brought to the jury's attention *incidentally*, rather it was presented in a series of statements and questions in such a method as to permit the jury to believe it material. (*People v. Bernette* (1964), 30 Ill. 2d 359, 371.) If any doubt existed as to its materiality, it was removed when defense counsel's objections were overruled. In overruling the objections the prejudicial effect was amplified. See *People v. Faysom* (1985), 131 Ill. App. 3d 517, 522.

The questions about the victim's family had no relevance to the defendant's guilt or innocence. The only purpose these questions could serve is to prejudice the defendant in the eyes of the jury, "and to arouse in them anger, hate and passion." (*People v. Dukes* (1957), 12 Ill. 2d 334, 340.) The extent to which such inflammatory questions affected the jury in its conviction and in its vote to impose the death penalty will never be known. But the defendant, no matter how reprehensible his crime, "be he a sinner or a saint, has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged" (*People v. Gregory* (1961), 22 Ill. 2d 601, 606), uninfluenced by the circumstance that the decedent's widow has been left to live alone with children of tender ages as the result of the murder.

As previously stated, the holding reached in each case dealing with reference to a murder victim's family will depend upon how such reference comes about. For example, in the recent case before our court of *People v. Adams* (1985), 109 Ill. 2d 102, we held that it was not

error for the prosecutor to have remarked that on the day of the murder the victim's "wife loved him enough to call him." In finding that such a remark was incidental, we distinguished that case from *People v. Bernette* (1964), 30 Ill. 2d 359. In *Bernette*, the defendant's conviction was reversed because there were numerous references throughout direct testimony and argument to the jury regarding the murder victim's young children. We believe the case at bar is analogous to *Bernette*.

Finally, the defendant has asserted that the evidence was insufficient to prove his guilt beyond a reasonable doubt. However, we find the evidence here to have been sufficient to sustain the convictions. We therefore find no impediment to a new trial. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.

For the reasons given, the defendant's conviction is reversed and the sentence of death is vacated. The cause is remanded to the circuit court of Cook County for a new trial and sentencing hearing.

*Judgment reversed;*
*sentence vacated;*
*cause remanded.*