THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL SIERRA HERNANDEZ, Defendant-Appellant.

Second District   No. 2—91—0287

Opinion filed June 18, 1993.

244

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of Geneva (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

The defendant, Miguel Sierra Hernandez, and three codefendants were charged by indictment with the murder of Guadulupe Jaimes. The indictment alleged that the defendant beat Jaimes on the head and neck, then cut his throat with a knife. Defendant's case was severed from that of the three codefendants for trial. A Kane County jury found defendant guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)), and the court sentenced him to a 35-year term of incarceration. On appeal defendant contends that he should be granted a new trial because (1) his trial attorney had a conflict of interest, (2) his trial attorney and the court-appointed attorney who represented him on post-trial motions provided ineffective assistance of counsel, and (3) the trial court committed reversible error by allowing the State to introduce prejudicial evidence about the victim's family.

Relevant facts produced at trial indicated that the body of Guadulupe Jaimes (Lupe) was discovered near a city park adjacent to the Fox River in Elgin, Illinois. Broken tree limbs with traces of the victim's blood on them were found near the body. Police recovered a knife, later identified as the one used to cut the victim's throat, from the Fox River. Defendant, together with Antonio Mendez and Antonio's cousins, Juan Mendez and Roberto Aguilar, were arrested for the murder.

During trial, the State introduced evidence that, following his arrest, defendant told the police through an interpreter that he, the other defendants, and the victim were at the Fox River drinking beer when a fight occurred between Roberto and the victim. After they calmed down, defendant picked up a small tree branch and hit the victim a couple of times, "just goofing around." In retaliation, the victim pulled out a metal chain with a lock at the end; however, Antonio took the chain and threw it in the river. The group then continued their beer drinking.

As the victim was departing, he stated that he was going home to get his brothers to return and "get" the defendant. In response, the defendant got mad and went after the victim. Although Antonio attempted to stop defendant, defendant hit the victim several more times with a tree limb until he was knocked to the ground and then

hit him one more time while he was down. Defendant's companion stated that if the victim was not dead it would be bad for defendant. Defendant then obtained a knife from the car in which the group had driven to the park. Resisting Antonio's efforts to stop him, defendant slashed the victim's throat and threw the knife in the river. Afterwards, Roberto departed the area by bicycle, and defendant drove Antonio and Juan home.

Defendant next picked up his girlfriend, Linda Lara, and her young daughter, and drove to an Elgin motel where they were residing. At the motel, defendant put his clothes and shoes in a garbage dumpster. In his statements to police, defendant denied telling his girlfriend the details of all that happened, but instead told her only that he had gotten into a fight with Roberto.

Linda Lara, called to testify as a State witness, stated that she was defendant's former fiancee. Before he was arrested, a June wedding had been scheduled. Prior to his arrest, defendant was a close friend of Antonio and saw him about every day. On June 5, the day of the alleged murder, she had driven defendant, Antonio and Juan to work at a construction site. Because it rained, they worked only part of the day. Thereafter, defendant went out with Antonio and Juan in Linda's car while Linda waited for him at Antonio's residence.

When defendant returned at 9:30 p.m., his shirt was ripped and his face smudged. Although defendant previously had been painting barns, Linda speculated that the red spots on his clothing may have been blood. At the motel later that night, the witness asked defendant why he was throwing out his clothes. He told her that he had cut the victim's throat. She did not recall if defendant told her he had hit the victim with a tree branch. This last testimony, however, was impeached with a taped statement Linda had made to the police on June 11, in which she indicated that defendant told her he had hit the victim with a tree limb.

Linda further testified that defendant never told her he was forced to injure the victim. Too, the day after the killing, while driving defendant, Antonio, and Juan to work, she heard defendant say that the victim was a "poor-stupid guy." Finally, according to Linda, the defendant was a heavy drinker and quite often got drunk with Antonio. On cross-examination, Linda said defendant was very drunk when he picked her up the night of the killing. About an hour before he picked her up that night, she saw him drive up to Antonio's house and then pull away very fast, although she did not tell this to the police in her taped statement because it seemed at the time a minor point.

When called as a defense witness, Linda stated that on June 10, the day defendant was arrested, she was driving defendant and her daughter from Elgin to Waukegan. Defendant was lying down in the car's backseat area because he was tired. The police, who had followed Linda from Elgin, stopped the car after observing defendant in the rear seat and arrested defendant. Linda stated that at the time of defendant's arrest she was unaware of any outstanding warrants for his arrest.

When called as a witness in his own behalf, defendant retracted virtually the entire statement he had given to the police at the time of his arrest. He testified that he had falsely incriminated himself because Antonio had threatened to kill Linda and her child if defendant told the police that it was Antonio and Roberto who had beaten Lupe with the tree limbs. As for the true story, defendant stated that the victim and Roberto had a fist fight. After the fight, Roberto pulled a knife on the victim, but Antonio took the knife away. The victim then accosted the defendant for helping break up the fight between him and Roberto. The victim took from his clothes a chain with a lock at the end and threatened defendant; however, Antonio took the chain and threw it in the river. The victim then accosted Antonio for throwing his chain in the river. A short time later, Antonio attempted to take the victim's jacket from him. As a result, Antonio and the victim started to fight. Roberto entered into the fight by picking up a stick and hitting the victim. Antonio also picked up a stick and struck the victim until he collapsed. Defendant told Antonio and Roberto to calm down, but Antonio hit the victim twice more on the head while he lay on the ground. At this time, defendant believed the victim had died from the beating.

Defendant, Antonio and Roberto returned to the car and started to drive to Antonio's residence. On the ride back, Roberto told defendant they would kill him if he told the police. After driving almost to the residence, Antonio pulled a knife on defendant and told him to drive back to the location of the victim's body. Roberto and Antonio, armed with knives, took defendant to the victim's body, and Antonio told him to cut the victim's throat. When defendant refused, Antonio threatened to cut defendant's throat. Antonio then gave defendant a knife and pushed him onto the victim's body. Believing him to be already dead, defendant cut the victim's throat. Antonio and Roberto then had defendant throw the knife into the river. Later, Antonio and Roberto threatened to kill defendant's girlfriend and child if he told the police about the killing. Although defendant testified that, prior to the killing, he had consumed 15 beers, smoked one

marijuana cigarette, and was very intoxicated, he denied ever striking the victim with a stick. Defendant's belief that the victim was already dead when defendant cut his throat was supported by the autopsy physician's testimony that the victim died from blunt trauma to his head and larynx before his throat was cut.

Shortly after the killing, defendant picked up Linda at Antonio's residence, and the two of them returned to the motel. Defendant told Linda to place the clothes he wore that evening in a dumpster. When she refused, defendant placed the clothes in the dumpster. On cross-examination defendant admitted that, on the night of the killing, he told Linda that Roberto and the victim had been in a fight; that he, the defendant, had beaten the victim with either logs, branches, or tree limbs; and that he had slashed the victim's throat and thrown the knife in the river. Defendant claimed he told Linda that story because of the threats by Antonio and Roberto, although he did not tell Linda that he had been threatened. Defendant denied that he knew the police were looking for him prior to his arrest. Defendant, who was age 34 at the time of the trial, stated that he grew up with Antonio, having known him since he was eight years old, and they were the best of friends. Roberto and Juan were Antonio's first cousins, and defendant was good friends with each of them.

Defendant first argues that his trial attorney had a conflict of interest, either *per se* or one resulting in substantial prejudice. In support of his argument, defendant observes that Linda Lara, a State's witness, paid the fees for his attorney and that his attorney had two years previously been Linda's lawyer in her divorce case. In support of his substantial prejudice argument, defendant points out that his attorney (1) did not cross-examine Linda as to certain parts of her testimony, and (2) did not call defendant as a trial witness to deny that Linda drove him and Antonio to work the day following the alleged murder and to rebut Linda's testimony that he stated the victim was a "poor-stupid guy." Defendant also relies on points one and two to support his complementary argument that his trial attorney provided ineffective legal assistance.

The fact that Linda Lara paid the attorney fees for defendant's trial was first brought to the court's attention when defendant's counsel, following post-trial motions and sentencing, appeared in court on a motion to appoint the appellate defender for purposes of appeal and the following dialogue occurred:

"THE COURT: Did I appoint the Appellate Defender?

MR. CANNING [defense attorney]: No, you didn't, Judge. That's what I am here to ask the Court to do.

MR. RAGO [State]: That's what we are here to do today.

THE COURT: I have to have a hearing to see if he has no money.

MR. CANNING: Judge, in my petition I have sworn under oath as a representative of court that—as you may remember, he testified at the last hearing date he had no property, the Defendant, or income.

THE COURT: *You were paid by the girlfriend, weren't you?* [Emphasis added.]

MR. CANNING: Yes. And—

THE COURT: All right."

It is abundantly clear that the right to effective assistance of counsel under the sixth amendment to the Constitution of the United States entitles the criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations. (*People v. Flores* (1989), 128 Ill. 2d 66, 83, citing *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.) Where defense counsel has represented a State's witness, a *per se* conflict of interest exists if " 'the professional relationship between the attorney and the witness is contemporaneous with counsel's representation of the defendant.' " (*Flores*, 128 Ill. 2d at 83, quoting *People v. Free* (1986), 112 Ill. 2d 154, 168, and referencing *People v. Robinson* (1979), 79 Ill. 2d 147, 161; *People v. Strohl* (1983), 118 Ill. App. 3d 1084.) Whether a *per se* conflict exists is dependent on the particular facts of each case. (*People v. Grigsby* (1977), 47 Ill. App. 3d 812, 817.) To determine whether a defense attorney has a conflict of interest, a court should look not to technicalities of the law of offer and acceptance for guidance; rather, the court should base the determination on a realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case. (*People v. Palmer* (1986), 141 Ill. App. 3d 234, 241.) Where a *per se* conflict of interest is not established, it is the defendant's burden to demonstrate prejudice resulting from any conflict of interest which may exist. *Flores*, 128 Ill. 2d at 84.

■■ We find no *per se* conflict of interest based on defense counsel's representation of Linda Lara in her divorce case or because Linda paid the fees of defendant's trial attorney. The attorney's representation of Linda Lara in her divorce case terminated long before he became defendant's attorney in the murder trial. Because the attorney's professional relationship relating to the divorce case was not contemporaneous with his representation of defendant, a *per se* conflict did not exist.

Defendant relies on the case of *People v. Palmer* (1986), 141 Ill. App. 3d 234, to support his argument that Linda Lara's payment of attorney fees constituted a *per se* conflict. Palmer was convicted of aggravated arson and aggravated battery of his spouse. During the trial, defendant's attorney attempted to withdraw because of a conflict of interest premised on defendant's wife being a potential State's witness, having paid some of defendant's attorney fees, and owing a balance thereon. The court denied the motion to withdraw, and defendant's wife voluntarily testified as a State's witness on the aggravated battery charge. On appeal, the court reasoned that the positions of defendant and his wife were clearly antagonistic and therefore a *per se* conflict of interest existed. We find *Palmer* distinguishable from the case before us.

In *Palmer*, defendant's wife was the victim of the crime. At times she wanted the charges dropped; at other times, she wanted defendant prosecuted. While the wife voluntarily testified at trial as a State's witness, she also owed money to defense counsel. In contrast, Linda Lara was not the victim of defendant's crime. There is no indication she wanted defendant prosecuted. On the contrary, because she was engaged to be married to defendant, it could be reasonably presumed she would not want defendant prosecuted. Importantly, the record does not show that she owed any balance of fees to defendant's attorney.

Defendant fails to cite any authority supporting the position that the mere payment of defendant's attorney fees coupled with testifying as the State's witness, without further facts establishing obvious antagonism, constitute a *per se* conflict of interest. The bare fact that a third person pays the attorney fees for a defendant does not necessarily establish that the attorney is the attorney for the third party in a legal proceeding. There is nothing in the record to show that defendant's attorney was retained by Linda Lara to provide legal advice to her or in any other way act as her lawyer in the traditional sense of that relationship. On the contrary, the facts indicate that Linda paid the attorney to represent defendant in the criminal proceeding against him, nothing more. We refuse to utilize speculation to create a situation, as suggested by defendant, in which the fees Linda paid the attorney were for the purpose of providing her legal advice or protection of her legal rights as to possible legal charges stemming from the death of Lupe.

Having decided that a *per se* conflict did not exist between defendant and his attorney, we are next called upon to decide whether defendant was prejudiced by the conflict of interest he alleges on ap-

peal. As we mentioned, defendant points out that counsel previously represented Linda and that Linda paid counsel's fees in this case. As a result, according to defendant, counsel did not fully and effectively cross-examine Linda Lara and did not call defendant as a witness to refute certain aspects of Linda's testimony. The resolution of the prejudice issue requires us to apply the same principles we must use to decide defendant's next issue, *i.e.*, whether his attorney provided ineffective assistance of counsel. (See *Free*, 112 Ill. 2d at 169.) Accordingly, we will combine our discussion of these two issues.

The standard for showing a want of effective assistance of counsel stated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27, is that the defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's professional shortcomings, the result of the proceedings would have been different. When considering defendant's claim of ineffective assistance of counsel, we entertain a strong presumption that defendant's counsel acted within the wide range of reasonable, competent assistance. (*People v. Johnson* (1989), 128 Ill. 2d 253, 266; *People v. Joyce* (1992), 234 Ill. App. 3d 394, 408.) We also generally refuse to second-guess defendant's attorney's trial strategy. (*People v. Potthast* (1991), 219 Ill. App. 3d 714, 720; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 1011.) In some cases, where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, prejudice is presumed and defendant need not show that his counsel's errors resulted in actual prejudice. (*United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047; *People v. Hattery* (1985), 109 Ill. 2d 449, 461.) Courts will presume prejudice only in an extremely narrow class of cases where there has not been a true adversarial relationship between defendant and the State. *People v. Watts* (1992), 226 Ill. App. 3d 519, 523; *People v. Pickett* (1991), 217 Ill. App. 3d 426, 428-29.

First, defendant specifically argues that he was denied effective assistance with resultant prejudice when his attorney failed adequately to cross-examine Linda Lara's testimony that she drove defendant, Antonio, and Juan to work the day following the alleged murder; that during the ride, defendant stated the victim was a "poor-stupid guy"; and that on the date of his arrest she drove defendant to Antonio's house. Defendant also attacks counsel's decision not to put him on the stand to rebut Linda's testimony. Defendant asserts that prejudice resulted because Linda's testimony inferen-

tially contradicted his defense that Antonio's threat to kill Linda and her baby compelled defendant to cut the victim's throat. The State responds that defense counsel's decision not to attempt impeachment of Linda Lara's testimony concerning defendant's contacts with Antonio the day following the murder was a matter of trial strategy.

■ A defendant cannot generally make out a claim for ineffective assistance of counsel based on his counsel's trial strategy. (*People v. Shum* (1987), 117 Ill. 2d 317, 370; *People v. Madej* (1985), 106 Ill. 2d 201, 214; *People v. Whittaker* (1990), 199 Ill. App. 3d 621, 628-29.) We believe that defense counsel's decision not to impeach Linda Lara, either through more vigorous cross-examination or putting defendant on the witness stand to rebut her testimony, was a matter of trial strategy. The biggest obstacle defendant faced in the trial was rationally to explain away his statement to the police that he, and not Antonio and Roberto, caused the victim's death by beating him with tree branches. Evidence based on the autopsy showed that the victim died as a result of injuries inflicted by being beaten with tree branches, not as a result of his throat being cut. Although the State impeached her with her prior inconsistent statement to the police, Linda gave support to defendant's testimony by stating that she did not remember defendant telling her that he beat the victim with a tree branch. While she was again impeached, this time by her prior failure to tell the police, Linda nevertheless gave additional support to the defense by testifying that she saw defendant, Antonio, and Roberto between 8 p.m. and 8:30 p.m. on June 5 in a car which sped away from Antonio's house without stopping. Linda further reinforced defendant's testimony that he was extremely intoxicated when she observed him at 9:30 p.m. on June 5.

Focusing on evidence that his engagement to Linda had ended, defendant urges that Linda therefore had a possible motive to give false testimony, *i.e.*, that she drove defendant and Antonio to work on June 6. We find this argument too specious to deserve comment. Defendant also argues that a possible reason for Linda lying is the possibility of the State charging her with being an after-the-fact accessory to the murder. However, the record nowhere reflects that Linda was aware the police were seeking to apprehend defendant prior to his arrest on June 10. Therefore, evidence of her aiding a fugitive was totally speculative.

The only parties having first-hand knowledge about the person or persons responsible for the victim's death were defendant, Antonio, Roberto, and Juan. The last three of these were generally not available as witnesses for defendant because charges were pending against

them for the victim's murder. More so, Antonio and Roberto were not reasonably available because defendant accused them of the victim's murder. Hence, Linda Lara was the only witness who could give some credibility to defendant's defense. Under the circumstances, it would have been rather difficult for counsel to argue to the jury that they should believe Linda on certain aspects of her testimony and disbelieve her on others. Counsel himself indicated this when, before the court on post-trial motions, he stated that "[t]here was one issue, Judge, where the witness, Linda Lara, had testified that the day after the murder, she drove the defendant, Miguel Hernandez, and several other individuals and Antonio Mendez to work. Mr. Hernandez had brought to my attention that Antonio Mendez was not in that car that morning, and, in my opinion, I chose not to open a can of worms by going into that morning after the murder." In sum, we believe that the decision of defendant's counsel not to impeach Linda Lara's testimony by further cross-examination or putting defendant on the witness stand to give testimony contradicting Linda was a matter of trial strategy and did not fall below the objective standard of reasonableness required by *Strickland*. Thus, defendant cannot prevail on his claim of ineffective assistance of counsel. Nor can he succeed on his conflict of interest argument. A conflict, if any, did not result in a substandard performance on counsel's part, and defendant, therefore, has not carried his burden of showing prejudice resulting from the alleged conflict.

Defendant next argues that the attorney appointed to represent him in post-conviction proceedings provided ineffective assistance because he failed to review the entire trial record and bring to the attention of the trial court the conflict of interest rising from trial counsel's fee arrangement with Linda Lara. The court appointed separate trial counsel to represent defendant in his post-trial claim of ineffective assistance of trial counsel based on the trial attorney's failure to impeach Linda Lara's testimony concerning the incidents on June 6. Based on our review of the record, we find no merit in defendant's argument.

The first record notice that Linda Lara paid defendant's attorney fees was March 8, 1991, when the trial attorney appeared in court on post-trial motions. Defendant's post-trial attorney was appointed to represent defendant for the limited issue of what had occurred during that part of the trial decided by the jury. Thus, even if defendant's post-trial attorney reviewed the entire transcript relating to the jury aspect of the trial, he would not have discovered that

Linda Lara paid defendant's attorney fees. We find no ineffective assistance with respect to defendant's post-trial attorney.

As a final matter, defendant asks that we find certain testimony concerning the victim's family to be reversible error requiring a new trial. The State called the deceased's father to testify. He entered the courtroom through a side door accompanied by his daughter, who was allowed to sit near him while he testified. After identifying his deceased son from a living photograph, he informed the jury, over the defendant's continuing objection, that he had six remaining children: Irma, age 26; Angelina, age 23; Sacramento, age 21; Ernesto, age 20; Jose Luis, age 9; and Augustino.

Defendant relies on *People v. Bernette* (1964), 30 Ill. 2d 359, *People v. Hope* (1986), 116 Ill. 2d 265, and *People v. Dukes* (1957), 12 Ill. 2d 334, as his basis for legal error. In *Bernette*, the defendant's conviction was reversed because there were numerous references throughout direct testimony and argument to the jury regarding the murder victim's young children. The *Hope* and *Dukes* cases also concerned numerous references to the surviving spouse and children of the murder victim which were elicited by the State. A defendant's guilt must be established by legal and competent evidence, and evidence in a murder prosecution that the deceased left a family has no relationship to the guilt or innocence of the accused but normally serves only to prejudice the defendant in the eyes of the jury. (*Hope*, 116 Ill. 2d at 275.) However, every mention of a deceased's family does not *per se* entitle the defendant to a new trial, since in certain instances, dependent on the facts, such statements can be harmless; this is particularly true when the death penalty is not imposed. (*People v. Hope*, 116 Ill. 2d at 276.) "Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." *People v. Free* (1983), 94 Ill. 2d 378, 415.

In examining the evidence that was introduced by the State concerning the family of the deceased, we note the following: the State's stated purpose in eliciting information about the deceased's family was to corroborate statements by the defendant to the police that he killed decedent partly because he was afraid of the decedent's brothers. When the State asked the deceased's father to state the names and ages of his sons, he nonresponsively added the names and ages of two daughters. Although defendant's attorney made a continuing objection to testimony about the decedent's family, no objection was made to the nonresponsive answers; nor did the State move to strike the nonresponsive answers. The only other indication of decedent's family was the fact that the father's daughter accompanied him

to the witness stand. The challenged testimony does not rise to the level of error.

We find the cases defendant relies on to be distinguishable. In each, the State made numerous emotionally premised references to decedent's family, consisting of spouse and children, in both the evidence and argument parts of the trial. In contrast, in defendant's case, there was only one reference to the family—a family which consisted, not of a spouse and children, but instead brothers and sisters. This occurred only during the evidence portion of the trial. Moreover, the testimony relating to decedent's adult brothers was arguably relevant as corroboration of testimony before the jury. Testimony about the sisters, while clearly not relevant, was volunteered. However, none of the testimony about decedent's family was brought out in a manner which would inflame the jury. Consequently, the error was harmless.

The judgment of the circuit court is affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.