2020 IL App (1st) 171484

SIXTH DIVISION
October 23, 2020

No. 1-17-1484

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 14557 |
| | ) | |
| HEGGIE CARR, | ) | |
| | ) | Honorable Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Harris and Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1       Defendant, Heggie Carr, appeals the dismissal of his postconviction petition after a third-stage evidentiary hearing. On appeal, he contends that the circuit court should have granted his petition because his trial attorney labored under a *per se* conflict of interest where the victim in his case hired defendant's attorney to represent him and testified against defendant at trial. Finding that defendant did not waive the *per se* conflict that arose, we reverse and remand for a new trial.

¶ 2                                   I. BACKGROUND

¶ 3     The following background is drawn from the record and this court's order from defendant's direct appeal: *People v. Carr*, 2014 IL App (1st) 122128-U. Defendant was charged with aggravated domestic battery and aggravated battery, among other offenses, after an incident on July 21, 2011, in which defendant beat the victim, Robin Hall, in a hotel room located at 6250 North Lincoln Avenue in Chicago. Two private attorneys, William Knox and Marc Gottreich, each filed an appearance for defendant on August 19, 2011. Knox was granted leave to withdraw six days later. Gottreich represented defendant for the rest of the pretrial proceedings and at trial, though Nicholas O'Connor, an associate at Gottreich's firm, appeared for defendant on one pretrial date.

¶ 4                                         A. Trial

¶ 5     At the April 2012 trial, Hall testified that she and defendant had been together for the past five years. Hall was an escort and defendant was her pimp. Hall further described defendant as "my man, my best friend, and everything." Hall would give defendant the money she made from escorting. At the time of the incident, she was staying in a second-floor hotel room with Michael Dillon. Hall had a phone conversation with defendant that did not go well, and she hung up the phone on him. When Hall opened the door to leave, defendant entered and began searching the room. After defendant saw Dillon in the bathroom, defendant started beating Hall. Defendant hit her with his fist, knocked her teeth out, fractured her cheek bone, and hit her with something metal. Hall escaped by jumping out of the window, whereupon someone grabbed the back of her shirt. Hall landed on her hip and side, breaking her pelvic bone and wrist. Hall blacked out, but remembered defendant asking if she was dead and throwing Hall's phone at her. Hall was later taken to the hospital, where she was treated for her injuries. After the incident, defendant sent Hall

a letter, stating that Hall "kn[e]w what to say" at trial, defendant missed her, and he was looking forward to returning home and celebrating their life together.

¶ 6    Michael Dillon also testified about the incident, stating that defendant had punched Hall and used objects to strike her.

¶ 7    After closing arguments, the court found defendant guilty of three counts of aggravated domestic battery and one count of aggravated battery. Defendant was sentenced as a Class X offender to concurrent 14-year prison terms on each count.

¶ 8                                    B. Direct Appeal

¶ 9    In his direct appeal, defendant raised claims relating to the sufficiency of the evidence and ineffective assistance of counsel, in that his counsel elicited certain harmful evidence. Defendant also contended that—pursuant to the one-act, one-crime doctrine—the trial court improperly convicted him of three separate aggravated domestic battery charges, in addition to one lesser charge of aggravated battery, for the commission of a single physical act. This court issued its decision on March 10, 2014, rejecting defendant's sufficiency of the evidence and ineffective assistance claims, but finding that the multiple convictions for aggravated domestic battery and the additional aggravated battery conviction were unwarranted under the one-act, one-crime doctrine. *Id.* Defendant's aggravated battery conviction and two of the aggravated domestic battery convictions were vacated. *Id.* ¶ 28. This court affirmed one conviction for aggravated domestic battery. *Id.*

¶ 10                          C. Postconviction Proceedings

¶ 11  On July 10, 2014, defendant filed a postconviction petition, asserting in part that he was denied the right to effective assistance of counsel because his trial attorney, Gottreich, labored under a *per se* conflict of interest. Defendant stated that Hall—who was the complaining witness,

the State's key witness, and the victim—hired and paid Gottreich to represent him. Further, Hall had owed a remaining balance. Defendant asserted that Gottreich never mentioned the conflict and defendant only learned of the conflict when his appellate counsel mailed him a copy of an attorney-client representation agreement.

¶ 12    Defendant attached several documents to his petition, including the aforementioned attorney-client representation agreement, a March 2013 letter to defendant from Gottreich, a March 2013 letter to defendant from the DePaul University College of Law legal clinic, and an affidavit from defendant's mother.

¶ 13    The attorney-client representation agreement stated in part:

"This agreement is entered into by and between the law firm of Gottreich & Grace ('Attorneys') and Robin Hall ('Client') on 8/16/11. The Attorneys agree to represent the Client in the pending criminal matter *** for the sum of 3000 plus any investigational or court costs ***.

***

The Attorneys and Client further agree that upon the signing of this Agreement, the Attorneys have been paid $1000 as an Advance Payment Retainer."

There were two signature lines. Hall appeared to have signed above the first line. It was unclear who signed above the second line, below which were typed the names Marc E. Gottreich and Timothy M. Grace.

¶ 14    Gottreich's March 2013 letter stated in part that "[a]s far as payments, Robin paid me $1,000 to get started and your mom paid the balance of $2000 prior to the trial for a total of $3,000 for your case. I received no other money."

¶ 15 The March 2013 letter from the DePaul University College of Law legal clinic included information about defendant's direct appeal and postconviction petition. The letter also referred to an invoice that had been provided by defendant's trial attorney and noted "Robin Hall" was the payor and "Marc Gottreich" was the payee. That invoice is not in the record.

¶ 16 Another attached document was an affidavit from defendant's mother, Martha Carr, who stated in part that she witnessed defense counsel give Hall advice about the case. Martha also stated that Gottreich worked out all of the payment agreements with Hall.

¶ 17 On October 17, 2014, the circuit court advanced defendant's petition to second-stage proceedings and appointed counsel. Defendant's postconviction counsel filed an Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) certificate, and the State filed a motion to dismiss the petition. After a hearing on the motion to dismiss, the court advanced the petition to a third-stage evidentiary hearing.

¶ 18 The evidentiary hearing was held on June 1, 2017. There, defendant testified that while he was in pretrial custody, a friend of the family named Tanesa hired an attorney with a last name of Knox to represent defendant. Gottreich also appeared on his case, and both attorneys appeared for him on the same date. On that date, defendant chose Gottreich to represent him based on Gottreich's proposed strategy. Knox withdrew. Gottreich told defendant he was hired "by the family," and defendant presumed that Tanesa had hired and paid him. After defendant was convicted, he learned that Gottreich had actually been hired by Hall. Gottreich did not tell defendant before or during the trial that Hall had hired him and never told defendant that Hall paid him any amount of money. After defendant was convicted, defendant's mother told him that Gottreich asked her to pay because he was not receiving the money from Hall. Defendant maintained that he did not direct anyone to contact or hire Gottreich on his behalf.

¶ 19    Gottreich also testified at the hearing, recalling that defendant's mother and Hall contacted Gottreich by phone. Someone came to his office with money, "[t]hey signed a contract," and Gottreich began representing defendant. He did not intend to represent anyone other than defendant. Gottreich stated that an associate in his firm, Nicholas O'Connor, signed the attorney-client representation agreement and Gottreich was not present when it was signed. Gottreich acknowledged that O'Connor "put the agreement between our law firm and Robin Hall," but the agreement "should have said Robin Hall on behalf of Heggie Carr or put Heggie Carr's name in." When the agreement was signed, Gottreich knew that Hall was the victim and witness. It was "not unusual for victims to hire us or pay us money on cases," especially in a situation that initially appeared to be "merely a misdemeanor domestic violence case." Initially, Gottreich spoke to Hall numerous times, but he did not indicate that he represented her. Hall stopped talking to Gottreich after a few months. Gottreich did not specifically recall talking to defendant about Hall's status as the victim who would testify, but was sure that he did. Gottreich did not see a conflict and did not bring the matter to the court's attention.

¶ 20    After closing arguments, the court issued an oral ruling that denied defendant's petition and stated as follows. Defendant was intelligent, and the relationship between a prostitute and her pimp "is a complicated and complex one." Defendant knew what Hall was doing when she visited Gottreich and gave him a $1000 deposit. Further, it was at least arguable that the money was defendant's because "they had this ongoing relationship." It was plausible that Hall was "just a mechanism, a vessel to take the money from wherever he accumulated it and pass it on to the attorney." The court queried, "How wide a door shall we open here today. How often do individuals, domestic partners, walk in and pay for their bail *** and go on to pay for an attorney." The court was concerned that if it found that paying a $1000 deposit was a *per se* conflict, then

"any time somebody, the victim of the alleged offense, is involved in obtaining money or paying money to some attorney, that that's a conflict." Also, Gottreich did "his rock-solid best" at trial, and there had been a large amount of evidence against defendant.

¶ 21   Defendant timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23   On appeal, defendant contends that he is entitled to postconviction relief because his trial attorney had a *per se* conflict of interest, in that Hall, the victim, hired and paid Gottreich $1000 to represent defendant and Gottreich knew that Hall was the victim. Further, defendant asserts that neither Gottreich nor the associate who met with Hall ever told the court that Hall had hired Gottreich or brought a potential conflict to the court's attention. Defendant also argues that the court never obtained a knowing waiver of the conflict from defendant.

¶ 24   The Post-Conviction Hearing Act (Act) provides a three-stage process for a defendant to challenge his conviction. 725 ILCS 5/122-1 *et seq.* (West 2012). To obtain relief, a defendant must show that he suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). At the third-stage evidentiary hearing, "the trial court hears evidence and determines whether, based on that evidence, the defendant is entitled to relief." *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 47. The defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. The trial judge is in the best position to observe and weigh the credibility of witnesses testifying at the evidentiary hearing. *People v. Ortiz*, 385 Ill. App. 3d 1, 6 (2008). Findings of fact are reviewed for manifest error (*id.*), which is an error that is clearly evident, plain, and indisputable (*Garcia*, 2015 IL App (1st) 131180, ¶ 47).

¶ 25    The sixth amendment of the United States Constitution guarantees the right to effective assistance of counsel (*People v. Spreitzer*, 123 Ill. 2d 1, 13 (1988)), which includes the right to conflict-free representation (*People v. Poole*, 2015 IL App (4th) 130847, ¶ 25). There are two types of conflicts: *per se* and actual. *Id.* In this appeal, defendant only raises a *per se* conflict, which is a conflict "in which facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict." (Emphasis in original.) (Internal quotation marks omitted.) *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008) (*Juan Hernandez*).

¶ 26    A *per se* conflict arises "[w]hen a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant." *Id.* Our supreme court has identified three types of *per se* conflicts: (1) when defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel was formerly a prosecutor and was personally involved in prosecuting the defendant. *Id.* at 143-44. If there is a *per se* conflict, the defendant is not required show that his counsel's performance was at all affected by the conflict. *Id.* at 143. Prejudice is presumed. *People v. Fountain*, 2012 IL App (3d) 090558, ¶ 17 (opinion of Holdridge, J.). "[U]nless a defendant waives the right to conflict-free counsel, a *per se* conflict is grounds for automatic reversal." (Internal quotation marks omitted.) *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 38. Automatic reversal is warranted because " 'counsel's knowledge that a result favorable to his other client or association would inevitably conflict with defendant's interest might subliminally affect counsel's performance in ways [that are] difficult to detect and demonstrate.' " *Fountain*, 2012 IL App (3d) 090558, ¶ 17 (opinion of Holdridge, J.) (quoting *Juan Hernandez*, 231 Ill. 2d at 143). Where the

record shows that the facts are undisputed, we review *de novo* the question of whether a *per se* conflict exists. *Juan Hernandez*, 231 Ill. 2d at 144.

¶ 27    The question here is whether Gottreich's connection to Hall falls into the first category of *per se* conflicts—"a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution" (*id.* at 143). Hall paid Gottreich $1000 to represent defendant. Defendant does not contend that Gottreich actually represented Hall.

¶ 28    The case most analogous to this matter is *People v. Palmer*, 141 Ill. App. 3d 234 (1986). In *Palmer*, defense counsel asked for leave to withdraw because the defendant's wife, who retained him as the defendant's attorney, was the complaining witness and a potential State's witness against the defendant. *Id.* at 236. The trial court denied the attorney's motion to withdraw. *Id.* On appeal, this court found that defense counsel "labored under, at the least, a possible conflict of interest in his representation of [the] defendant." *Id.* at 240. The court stated that to determine whether there is a conflict of interest, a court should make "a realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case." *Id.* at 241. The court noted that the positions of the defendant and his wife "were clearly antagonistic." *Id.* at 242. Although the wife had at times indicated that she wanted the defendant's charges dropped, at other times she wanted the State to prosecute the defendant. *Id.* The court concluded that at least a potential conflict was present and reversed the defendant's conviction and remanded for a new trial. *Id.*

¶ 29    Although *Palmer* characterizes the conflict of interest at issue as a possible or potential conflict, the court was actually identifying a *per se* conflict. See *Spreitzer*, 123 Ill. 2d at 14 (noting confusing and inconsistent use of terms to describe conflicts of interest, including such terms as *per se* conflict, potential conflict, and possible conflict). The *Palmer* court applied the remedy for

*per se* conflicts—automatic reversal without a finding of prejudice. See *Palmer*, 141 Ill. App. 3d at 242; see also *Juan Hernandez*, 231 Ill. 2d at 143 (if there is a *per se* conflict, a defendant does not have to show he was prejudiced by the conflict). The situation here is nearly identical to the situation in *Palmer*. The victim, who was a key State witness, paid defendant's attorney fees. Hall's and defendant's positions were clearly antagonistic. Gottreich labored under a *per se* conflict of interest. See *People v. Sanchez*, 161 Ill. App. 3d 586, 593 (1987) (*per se* conflicts arise when "defense counsel has professional commitments to others having interests clearly antagonistic to those of the accused"). Also, that Gottreich's associate may have taken the money from Hall does not change the result. See *Fountain*, 2012 IL App (3d) 090558, ¶ 16 (opinion of Holdridge, J.) ("if one member of a private law firm has a *per se* conflict of interest, that conflict is imputed to all other members of the law firm, regardless of whether any of those other members had any personal involvement in the conflicting representation").

¶ 30    Further supporting a *per se* conflict here is our supreme court's broad language defining such conflicts, which include circumstances beyond counsel's representation of another person adverse to the defendant. In *Juan Hernandez*, 231 Ill. 2d at 151, the court stated that the first category of *per se* conflicts arises from "counsel's association, relationship, commitment, professional connection, or some tie with the victim, a party, or the prosecution, which is either prior or current or previous or current." (Internal quotation marks omitted.) Also, the "very nature of a *per se* conflict rule precludes inquiry into the specific facts of a case," and the fact of actual commitment to another, and not the degree or extent of the commitment, dictates applying the *per se* rule. *Id.* at 150-51 (citing *People v. Lawson*, 163 Ill. 2d 187, 216 (1994)). Hall's payment of the fee to Gottreich's firm—even though it was only a portion of the total—falls within the definition set out in *Juan Hernandez*.

¶ 31    The State's sources of support are not persuasive. The State primarily relies on *People v. Graham*, 206 Ill. 2d 465 (2003), and *People v. Hernandez*, 246 Ill. App. 3d 243 (1993) (*Miguel Hernandez*). In *Graham*, 206 Ill. 2d at 470, the defendant contended that his trial attorney labored under a *per se* conflict of interest because his attorney previously represented a prosecution witness, named Johnny, who was also the son of one of the victims. At the request of Johnny's uncle, the defendant's attorney went to the police station after a murder when Johnny had been taken there for questioning. *Id.* In the trial court, the attorney maintained that he did not speak to Johnny and left the police station after he was told that Johnny was not a suspect. *Id.* at 471. The attorney was not paid by the victim's family. *Id.* Our supreme court found that there was no *per se* conflict of interest where the "record [was] devoid of any evidence" that the attorney agreed to represent Johnny and the attorney and Johnny did not have an attorney-client relationship. *Id.* at 474. *Graham* addressed an attorney's purported representation, but here, there is no allegation that Gottreich represented Hall. As discussed above, ties other than an attorney-client relationship can create a *per se* conflict of interest. *Graham* does not address the question before us—whether the fact that the victim paid the defendant's attorney creates a *per se* conflict of interest.

¶ 32    Turning to the State's other case, in *Miguel Hernandez*, 246 Ill. App. 3d at 248, the defendant contended that his attorney had a *per se* conflict of interest because a State's witness paid his attorney fees and the attorney had previously been the witness's divorce lawyer. The court found there was no *per se* conflict of interest, noting that the attorney's representation of the witness in her divorce case "terminated long before he became [the] defendant's attorney." *Id.* at 249. The court also stated that the witness was not the victim of the defendant's crime. *Id.* at 250. The court further stated that the defendant had not cited any authority "supporting the position that the mere payment of [the] defendant's attorney fees coupled with testifying as the State's witness,

without further facts establishing obvious antagonism, constitutes a *per se* conflict of interest." *Id.* Here, there is a key fact that was missing from *Miguel Hernandez*. Hall was the victim, and so defendant and Hall were antagonistic in ways that the defendant and the witness in *Miguel Hernandez* were not.

¶ 33　Having concluded that Gottreich had a *per se* conflict, the next question is whether defendant waived his right to conflict-free counsel. See *Juan Hernandez*, 231 Ill. 2d at 143 (*per se* conflict is grounds for automatic reversal unless the defendant waived his right to conflict-free counsel). To be valid, a waiver must be knowing, meaning that the defendant was admonished as to the existence of the conflict and its significance. *People v. Acevedo*, 2018 IL App (2d) 160562, ¶ 18. Courts indulge "every reasonable presumption against *** waiver." (Internal quotation marks omitted.) *Lawson*, 163 Ill. 2d at 209. Below, the circuit court posited that defendant knew that Hall had paid Gottreich. That is insufficient. Gottreich never brought the conflict to the court's attention, and there is no evidence that defendant was informed of how that conflict could affect his representation. See *Acevedo*, 2018 IL App (2d) 160562, ¶ 20 (the defendant was not advised of the significance of the conflict where counsel never explained to the court what information he had provided to the defendant about the ramifications of the conflict and the defendant did not indicate "that he knew the possible impact that the conflict could have on counsel's ability to zealously represent him"); *Poole*, 2015 IL App (4th) 130847, ¶ 36 (the defendant was not adequately informed of the significance of the conflict where the record did not reveal "whether [he] was advised of the conflict in a way he might understand how it could affect his representation"). Because the record does not indicate that defendant knowingly waived the conflict, reversal and a new trial are required.

¶ 34    The circuit court expressed concern about opening the door to claims for the many other instances where victims pay defendants' legal fees. Yet, that is "a risk that this court is prepared to take to ensure adequate representation for defendants." (Internal quotation marks omitted.) *Cleveland*, 2012 IL App (1st) 101631, ¶ 51 (citing *People v. Coslet*, 67 Ill. 2d 127, 136 (1977)). That a *per se* conflict exists does not mean that victims can never pay defendants' attorney fees. All Gottreich had to do in this case was inform the court of the conflict, rather than decide for himself that the conflict was not a problem. The trial court could then have secured the necessary waiver after an informed decision from defendant.

¶ 35                                III. CONCLUSION

¶ 36    For the foregoing reasons, we reverse the circuit court's denial of defendant's third-stage postconviction petition, reverse defendant's conviction, and remand for a new trial.

¶ 37    Reversed and remanded.

---

**No. 1-17-1484**

---

| | |
|---|---|
| **Cite as:** | *People v. Carr*, 2020 IL App (1st) 171484 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-14557; the Hon. Nicholas Ford, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Deborah Nall, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |

---